UNITED STATES *v.* WILL ET AL.

No. 79–983. Argued October 13, 1980—Decided December 15, 1980*

---

*Together with No. 79–1689, *United States* v. *Will et al.,* also on appeal from the same court.

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except BLACKMUN, J., who took no part in the decision of the cases.

*Acting Solicitor General Geller* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Daniel, Mark I. Levy, Anthony J. Steinmeyer, Neil H. Koslowe,* and *Mark N. Mutterperl.*

*Kevin M. Forde* argued the cause for appellees. With him on the brief was *Richard J. Prendergast.*†

CHIEF JUSTICE BURGER delivered the opinion of the Court.

These appeals present the questions whether under the Compensation Clause, Art. III, § 1, Congress may repeal or modify a statutorily defined formula for annual cost-of-living increases in the compensation of federal judges, and, if so, whether it must act before the particular increases take effect.

I

Congress has enacted an interlocking network of statutes to fix the compensation of high-level officials in the Executive, Legislative, and Judicial Branches, including federal judges. It provides for quadrennial review of overall salary levels and annual cost-of-living adjustments determined in the same fashion as those for federal employees generally. In four consecutive fiscal years, Congress, with respect to these high-level

---

†Briefs of *amici curiae* urging affirmance in both cases were filed by *Leonard F. Janofsky, John A. Sutro, Francis R. Kirkham,* and *C. Douglas Floyd* for the American Bar Association; by *Richard William Austin* and *John F. McCarthy* for the Chicago Bar Association; and by *Nancy Y. Bekavac* and *Richard Coleman* for the Los Angeles County Bar Association.

Executive Branch, Legislative, and Judicial salaries, enacted statutes to stop or to reduce previously authorized cost-of-living increases initially intended to be automatically operative under that statutory scheme, once the Executive had determined the amount. In two of these years, the legislation was signed by the President and became law before the start of the fiscal year; in the other two years, on or after the first day of the fiscal year.

## A

The salaries of high-level Executive, Legislative, and Judicial officials are set under the Postal Revenue and Federal Salary Act of 1967, 81 Stat. 642, as amended, 2 U. S. C. §§ 351–361 (1976 ed. and Supp. III). The Salary Act provides for a quadrennial review, starting in 1969, of these officials' compensation. A Commission on Executive, Legislative, and Judicial Salaries periodically examines the salary levels for these positions in relation to one another and to the General Schedule (GS), the matrix of grades and steps that determines the salaries of most federal employees. Its recommendations are submitted to the President, who in turn submits that report with his recommendations to Congress in the next budget. Each House of Congress must vote on the President's proposal within 60 days. If both Houses approve, the adjustment takes effect at the start of the first pay period beginning 30 days thereafter.[1]

In 1975, Congress adopted the Executive Salary Cost-of-Living Adjustment Act, Pub. L. 94–82, 89 Stat. 419. The Adjustment Act subjects the salaries covered by the Salary Act to the same annual adjustment made in the General Schedule under the Federal Pay Comparability Act of 1970, 5 U. S. C. §§ 5305–5306. The Comparability Act requires that each year the President designate an agent to compare federal salaries to data on private-sector salaries compiled by

---

[1] The Salary Act, as amended, does not expressly prescribe what occurs if either House of Congress disapproves. See 2 U. S. C. § 359 (1976 ed., Supp. III).

the Bureau of Labor Statistics. The agent must undertake certain steps in his investigation and, ultimately, submit a report to the President recommending adjustments as deemed appropriate to bring federal employees' salaries in line with prevailing rates in the private sector. A separate Advisory Committee on Federal Pay then reviews that report and makes its own independent recommendation. Thereafter, the President issues an order adjusting the salaries of federal employees and submits a report to Congress listing the overall percentage of the adjustment and including the reports and recommendations submitted to him on the subject. If the President believes that economic conditions or conditions of national emergency make the planned adjustment inappropriate, he may submit to Congress before September 1 an alternative plan for adjusting federal employees' salaries. This alternative plan controls unless within 30 days of continuous legislative session either House of Congress adopts a resolution disapproving of the President's proposed plan. If one House disapproves, the agent's recommendation governs. The increases take effect with the start of the first pay period starting on or after the beginning of the federal fiscal year on October 1.

This complex web of base salaries adjusted annually for civil service employees and again quadrennially for higher-rank positions has led to the following statutory definition of a United States district judge's compensation:

> "Each judge of a district court of the United States shall receive a salary at an annual rate determined under section 225 of the Federal Salary Act of 1967 (2 U. S. C. 351–361), as adjusted by section 461 of this title." 28 U. S. C. § 135.

Similarly phrased statutes apply to all other Article III judges.[2] Title 28 U. S. C. § 461 in turn provides that the an-

---

[2] See 28 U. S. C. § 5 (the Chief Justice and each Associate Justice of the Supreme Court); 28 U. S. C. § 44 (d) (circuit judges); 28 U. S. C.

nual GS adjustment, rounded to the nearest multiple of $100, shall apply to salaries subject to that section, effective at the start of the next pay period. Compensation of judges is set at an annual figure and paid monthly, with each pay period coinciding with the calendar month. See 5 U. S. C. § 5505. Accordingly, any annual change in salary under the Adjustment Act takes effect at the beginning of October, the start of the fiscal year.

## B

In October 1975, GS salaries were increased by an average of 5% under the terms of the Comparability Act. Federal judges and the other officials covered by the Adjustment Act received similar increases. In each of the following four years, however, Congress adopted a statute that altered the application of the Adjustment Act for the officials of the three branches subject to it. To avoid the confusion generated by a fiscal year's having a number different from the calendar year in which it begins, we refer to these as Years 1, 2, 3, and 4. We turn now to the specific actions taken for each of the four years in question.

### Year 1

In October 1976, GS salaries were increased by an average of 4.8% under the procedures of the Comparability Act outlined earlier. On October 1, the first day of the new fiscal year and the first day of the relevant pay period, the President signed the Legislative Branch Appropriation Act, 1977, Pub. L. 94–440, 90 Stat. 1439. Title II of that statute provided:

> "[N]one of the funds contained in this Act shall be used to increase salaries of Members of the House of Representatives . . . . No part of the funds appropriated in

§ 173 (Court of Claims); 28 U. S. C. § 213 (Court of Customs and Patent Appeals); 28 U. S. C. § 252 (Court of International Trade (formerly Customs Court)).

this Act or any other Act shall be used to pay the salary of an individual in a position or office referred to in section 225 (f) of the Federal Salary Act of 1967, as amended (2 U. S. C. 356), including a Delegate to the House of Representatives, at a rate which exceeds the salary rate in effect on September 30, 1976, for such position or office . . . ."

By virtue of the reference to the Salary Act, this statute applied to federal judges; its import, therefore, was to prohibit paying the 4.8% raise on October 1, 1976, under the Adjustment Act to federal judges, as well as Members of Congress and high-level officials in the Executive Branch.

In March 1977, Members of Congress, federal judges, and high-ranking employees in the Executive Branch received raises pursuant to the quadrennial review under the Salary Act. The salary of a United States district judge, for example, increased to $54,500; circuit judges and special appellate judges, to $57,500; Associate Justices of the Supreme Court, to $72,000. 42 Fed. Reg. 10297 (1977).[3]

## Year 2

In October 1977, GS salaries, which generally are not subject to the quadrennial review under the Salary Act, were increased an average of 7.1% under the Comparability Act. On July 11, 1977, the President signed Pub. L. 95–66, 91 Stat. 270, which provided:

"[T]he first adjustment which, but for this Act, would be made after the date of enactment of this Act under the following provisions of law in the salary or rate of pay

---

[3] These amounts exceeded the levels these salaries would have achieved had Congress left in effect the 4.8% increase from October 1, 1976. Therefore, appellees' complaint in No. 79–983 challenged the statute in Year 1 only insofar as it affected judicial compensation from October 1, 1976, to March 1, 1977. See n. 6, *infra*.

of positions or individuals to which such provisions apply [the 7.1% in October 1977], shall not take effect:

. . . . .

"(3) section 461 of title 28, United States Code, relating to comparability adjustments in the salary and rate of pay of justices, judges, commissioners, and referees . . . ."

Parallel subdivisions applied to the other officials under the Salary Act. According to the House Report on this measure, an Adjustment Act increase would be inappropriate following the Comparability Act increase earlier in the same calendar year. H. R. Rep. No. 95–458, p. 2 (1977).[4] The effect of this statute was to nullify the contemplated 7.1% increase for these high-level executive employees, Members of Congress, and federal judges.

### Year 3

For the fiscal year beginning October 1, 1978, the President approved the recommendation to increase GS salaries an average of 5.5%. On September 30, 1978, the final day of the preceding fiscal year, however, the President signed the Legislative Branch Appropriation Act, 1979, Pub. L. 95–391, 92 Stat. 763. Section 304 (a) of that Act stated:

"No part of the funds appropriated for the fiscal year ending September 30, 1979, by this Act or any other Act may be used to pay the salary or pay of any individual in any office or position in the legislative, executive, or judicial branch, or in the government of the District of Columbia, at a rate which exceeds the rate (or maximum rate, if higher) of salary or basic pay payable for such office or position for September 30, 1978 . . . ."

---

[4] See also 123 Cong. Rec. 7126 (1977) (remarks of Sen. Scott) ("prevents people . . . from receiving two pay raises in 1 year"); *id.*, at 21121 (remarks of Rep. Solarz) ("individuals who have already received one increase during the course of the current year should not be entitled to receive a second increase as well"); *infra*, at 222, and n. 24.

The effect of this provision was to prohibit paying the 5.5% increase authorized by the Adjustment Act for the fiscal year beginning October 1, 1978.

## Year 4

For the fiscal year beginning October 1, 1979, the President's statutory agent transmitted a recommendation for an average increase of 10.41%. However, on August 31, the President invoked his power under the Comparability Act to alter this rate; he reduced the proposed increase to 7% from the 10.41% recommended. These increases, the Government concedes, took effect on October 1, 1979. Moreover, because the September 30, 1978, statute (Year 3) prohibited paying the 5.5% increase only during fiscal year 1979, that increase took effect as well; along with the 7% adjustment, this brought the total to 12.9%.[5] Nevertheless, the Government now contends that this increase was in effect for only 11 days, since on October 12, the President signed Pub. L. 96-86, 93 Stat. 656. Section 101 (c) of this statute stated, in relevant part:

> "For fiscal year 1980, funds available for payment to executive employees, which includes Members of Congress, who under existing law are entitled to approximately 12.9 percent increase in pay, shall not be used to pay any such employee or elected or appointed official any sum in excess of 5.5 percent increase in existing pay and such sum if accepted shall be in lieu of the 12.9 percent due for such fiscal year."

None of the appellees have exercised the statutory option to accept the 5.5% increase pursuant to the final clause of this statute; in terms that statute provides such acceptance of the 5.5% operates as a waiver of all claims to rates higher than

[5] The 7% increase was computed on the salary levels as they stood after the addition of the 5.5% increase deferred from Year 3. The compounding of the two increases means that the employees affected felt a combined increase of 12.9%. This explains the additional 0.4%.

the 5.5%. The Government concedes the 5.5% increase has continued in effect.

## C

On February 7, 1978, 13 United States District Judges filed an action (No. 79–983 in this Court) in the District Court for the Northern District of Illinois. The complaint, which named the United States as defendant, challenged the validity of the statutes in Years 1 and 2 under the Compensation Clause, U. S. Const., Art. III, § 1.[6] The plaintiff judges were certified as representatives of two classes of Article III judges, the classes defined with reference to Years 1 and 2.[7] The Government, while not opposing certification of the classes, defended the validity of both statutes.

In an opinion filed August 29, 1979, the District Court granted summary judgment for the plaintiffs, appellees here. 478 F. Supp. 621. A corresponding judgment order was entered September 24. On appeal by the Government, we postponed decision on jurisdiction to the hearing on the merits and directed the parties to address the effect of 28 U. S. C. § 455, if any, on the jurisdiction of the District Court and this Court. 444 U. S. 1068 (1980).

No. 79–1689 comes to us from a similar complaint filed in the United States District Court for the Northern District of

---

[6] The plaintiffs challenged the statute in Year 1 only insofar as it applied to compensation earned from October 1, 1976, until March 1, 1977, the date the quadrennial increase under the Comparability Act took effect. See n. 3, *supra*.

[7] For Year 1, the class was defined as all Article III judges serving during part or all of the period October 1, 1976, to March 1, 1977, the date the quadrennial increase under the Comparability Act took effect. See n. 6, *supra*. For Year 2, the class was defined as all Article III judges taking office prior to July 11, 1977, the date the statute was passed, and continuing in office after October 1, 1977, the date the Adjustment Act increase was due to take effect.

The case was referred to a newly appointed member of the District Court who had taken office after October 1, 1977, and thus was not a member of either class.

Illinois on October 19, 1979, after the District Court had entered judgment in No. 79–983. At issue this time were the statutes in Years 3 and 4. The same 13 judges, joined by one other, again sought to represent two classes of Article III judges defined by the years.[8] The United States is defendant. The case was referred to the same member of the District Court who had presided over the proceedings in No. 79–983.

On January 31, 1980, the District Court entered an order certifying the classes and granting summary judgment for the plaintiffs, appellees in No. 79–1689. Based on its decision in No. 79–983, the court held that the statute in Year 3 violated the Compensation Clause. The court noted with respect to Year 4 that the relevant statute referred only to "executive employees." It then held that while it was doubtful Congress intended the statute to apply to judges, the statute would be unconstitutional if Congress did so intend. In either case, the Adjustment Act increase for Year 4 took effect. Judgment for appellees was formally entered February 12. On the Government's appeal to this Court, we postponed consideration of jurisdiction to the merits and consolidated this case with No. 79–983 for briefing and oral argument. 447 U. S. 919 (1980).

## II

### A

#### *Jurisdiction*

Although it is clear that the District Judge and all Justices of this Court have an interest in the outcome of these cases, there is no doubt whatever as to this Court's jurisdiction

---

[8] For Year 3, the class was defined as all Article III judges in office on October 1, 1978, the date of the scheduled Adjustment Act increase, and continuing in office thereafter. For Year 4, the class was defined as all Article III judges in office on October 1, 1979, the date the Adjustment Act increase took effect, and continuing in office through October 12, 1979, the date the Year 4 statute was signed.

under 28 U. S. C. § 1252 [9] or that of the District Court under 28 U. S. C. § 1346 (a)(2) (1976 ed., Supp. III).[10] Section 455 of Title 28 [11] neither expressly nor by implication purports to deal with jurisdiction. On its face § 455 provides for disqualification of individual judges under specified circumstances; it does not affect the jurisdiction of a court. Nothing in the text or the history of § 455 suggests that Congress intended, by that section, to amend the vast array of statutes conferring jurisdiction over certain matters on various federal courts.

## B

### *Disqualification*

Jurisdiction being clear, our next inquiry is whether 28 U. S. C. § 455 or traditional judicial canons [12] operate to dis-

---

[9] This section provides in part:

"Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party."

[10] This provision confers on the district courts and the Court of Claims concurrent jurisdiction over actions against the United States based on the Constitution when the amount in controversy does not exceed $10,000. The complaints in both No. 79–983 and No. 79–1689 state that the claims of individual members of the classes do not exceed $10,000, an allegation the Government has not disputed. See App. 9a, 62a.

[11] This section provides in relevant part:

"(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

"(b) He shall also disqualify himself in the following circumstances:

"(4) He knows that he . . . has a financial interest in the subject matter in controversy . . . ;

"(5) He . . .

"(i) Is a party to the proceeding . . . ."

[12] See, e. g., ABA, Code of Judicial Conduct, Canon 3 (C).

qualify all United States judges, including the Justices of this Court, from deciding these issues. This threshold question reaches us with both the Government and the appellees in full agreement that § 455 did not require the District Judge, and does not now require each Justice of this Court, to disqualify himself. Rather, they agree the ancient Rule of Necessity prevails over the disqualification standards of § 455. Notwithstanding this concurrence of views resulting from the Government's concession, the sensitivity of the issues leads us to address the applicability of § 455 with the same degree of care and attention we would employ if the Government asserted that the District Court lacked jurisdiction or that § 455 mandates disqualification of all judges and Justices without exception.

In federal courts generally, when an individual judge is disqualified from a particular case by reason of § 455, the disqualified judge simply steps aside and allows the normal administrative processes of the court to assign the case to another judge not disqualified. In the cases now before us, however, all Article III judges have an interest in the outcome; assignment of a substitute District Judge was not possible. And in this Court, when one or more Justices are recused but a statutory quorum of six Justices eligible to act remains available, see 28 U. S. C. § 1, the Court may continue to hear the case. Even if all Justices are disqualified in a particular case under § 455, 28 U. S. C. § 2109 authorizes the Chief Justice to remit a direct appeal to the Court of Appeals for final decision by judges not so disqualified.[13]

---

[13] Section 2109 provides, in relevant part:

"If a case brought to the Supreme Court by direct appeal from a district court cannot be heard and determined because of the absence of a quorum of qualified justices, the Chief Justice of the United States may order it remitted to the court of appeals for the circuit including the district in which the case arose, to be heard and determined by that court either sitting in banc or specially constituted and composed of the three

However, in the highly unusual setting of these cases, even with the authority to assign other federal judges to sit temporarily under 28 U. S. C. §§ 291–296 (1976 ed. and Supp. III), it is not possible to convene a division of the Court of Appeals with judges who are not subject to the disqualification provisions of § 455. It was precisely considerations of this kind that gave rise to the Rule of Necessity, a well-settled principle at common law that, as Pollack put it, "although a judge had better not, if it can be avoided, take part in the decision of a case in which he has any personal interest, yet he not only may but must do so if the case cannot be heard otherwise." F. Pollack, A First Book of Jurisprudence 270 (6th ed. 1929).

## C

### Rule of Necessity

The Rule of Necessity had its genesis at least five and a half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge. Y. B. Hil.

---

circuit judges senior in commission who are able to sit, as such order may direct. The decision of such court shall be final and conclusive. In the event of the disqualification or disability of one or more of such circuit judges, such court shall be filled as provided in chapter 15 of this title."

The second paragraph of the section provides that, in all other cases when a quorum of qualified Justices is unable to sit, the Court shall enter an order affirming the judgment extant, which shall have the precedential effect of an affirmance by an equally divided Court.

The original version of this section was designed to ensure that the parties in antitrust and Interstate Commerce Commission cases, which at that time could be appealed directly to this Court, would always have some form of appellate review. See H. R. Rep. No. 1317, 78th Cong., 2d Sess., 2 (1944). Congress broadened this right in the 1948 revision of Title 28 to include all cases of direct review. H. R. Rep. No. 308, 80th Cong., 1st Sess., A175–A176 (1947).

8 Hen. VI, f. 19, pl. 6.[14] Early cases in this country confirmed the vitality of the Rule.[15]

The Rule of Necessity has been consistently applied in this country in both state and federal courts. In *State ex rel. Mitchell* v. *Sage Stores Co.*, 157 Kan. 622, 143 P. 2d 652 (1943), the Supreme Court of Kansas observed:

> "[I]t is well established that actual disqualification of a member of a court of last resort will not excuse such member from performing his official duty if failure to do so would result in a denial of a litigant's constitutional right to have a question, properly presented to such court, adjudicated." *Id.*, at 629, 143 P. 2d, at 656.

Similarly, the Supreme Court of Pennsylvania held:

> "The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest—where no provision is made for calling another in, or where no one else can take his place—it is his duty to hear and decide, however disagreeable it may be." *Philadelphia* v. *Fox,* 64 Pa. 169, 185 (1870).

Other state [16] and federal [17] courts also have recognized the Rule.

---

[14] Rolle's Abridgment summarized this holding as follows:

"If an action is sued in the bench against all the Judges there, then by necessity they shall be their own Judges." 2 H. Rolle, An Abridgment of Many Cases and Resolutions at Common Law 93 (1668) (translation).

[15] For example, in *Mooers* v. *White,* 6 Johns. Ch. 360 (N. Y. 1822), Chancellor Kent continued to sit despite his brother-in-law's being a party; New York law made no provision for a substitute chancellor. See *In re Leefe,* 2 Barb. Ch. 39 (N. Y. 1846). See also cases cited in Annot., 39 A. L. R. 1476 (1925).

[16] *E. g., Moulton* v. *Byrd,* 224 Ala. 403, 140 So. 384 (1932); *Olson* v. *Cory,* 26 Cal. 3d 672, 609 P. 2d 991 (1980); *Nellius* v. *Stiftel,* 402 A. 2d 359 (Del. 1978); *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 368 A. 2d 125 (1976); *Wheeler* v. *Board of Trustees of Fargo Consol. School*

The concept of the absolute duty of judges to hear and decide cases within their jurisdiction revealed in Pollack, *supra,* and *Philadelphia* v. *Fox, supra,* is reflected in decisions of this Court. Our earlier cases dealing with the Compensation Clause did not directly involve the compensation of Justices or name them as parties, and no express reference to the Rule is found. See, *e. g., O'Malley* v. *Woodrough,* 307 U. S. 277 (1939); *O'Donoghue* v. *United States,* 289 U. S. 516 (1933); *Evans* v. *Gore,* 253 U. S. 245 (1920). In *Evans,* however, an action brought by an individual judge in his own behalf, the Court by clear implication dealt with the Rule:

> "Because of the individual relation of the members of this court to the question . . . , we cannot but regret that its solution falls to us . . . . But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have any direct personal interest; and there was no other appellate tribunal to which under the law he could go." *Id.,* at 247–248.[18]

--------

*Dist.,* 200 Ga. 323, 37 S. E. 2d 322 (1946); *Schward* v. *Ariyoshi,* 57 Haw. 348, 555 P. 2d 1329 (1976); *Higer* v. *Hansen,* 67 Idaho 45, 170 P. 2d 411 (1946); *Gordy* v. *Dennis,* 176 Md. 106, 5 A. 2d 69 (1936); *State ex rel. Gardner* v. *Holm,* 241 Minn. 125, 62 N. W. 2d 52 (1954); *State ex rel. West Jersey Traction Co.* v. *Board of Public Works,* 56 N. J. L. 431, 29 A. 163 (1894); *Long* v. *Watts,* 183 N. C. 99, 110 S. E. 765 (1922); *First American Bank & Trust Co.* v. *Ellwein,* 221 N. W. 2d 509 (N. D.), cert. denied, 419 U. S. 1026 (1974); *McCoy* v. *Handlin,* 35 S. D. 487, 153 N. W. 361 (1915); *Alamo Title Co.* v. *San Antonio Bar Assn.,* 360 S. W. 2d 814 (Tex. Civ. App.), writ ref'd, no rev. error (Tex. 1962).

[17] *E. g., Atkins* v. *United States,* 214 Ct. Cl. 186, 556 F. 2d 1028 (1977), cert. denied, 434 U. S. 1009 (1978); *Pilla* v. *American Bar Assn.,* 542 F. 2d 56 (CA8 1976); *Brinkley* v. *Hassig,* 83 F. 2d 351 (CA10 1936); *United States* v. *Corrigan,* 401 F. Supp. 795 (Wyo. 1975).

[18] *O'Malley* cast doubt on the substantive holding of *Evans,* see n. 31, *infra,* but the fact that the Court reached the issue indicates that it did not question this aspect of the *Evans* opinion.

It would appear, therefore, that this Court so took for granted the continuing validity of the Rule of Necessity that no express reference to it or extended discussion of it was needed.[19]

## D

### *Limited Purpose of Section 455*

The objective of § 455 was to deal with the reality of a positive disqualification by reason of an interest or the appearance of possible bias. The House and Senate Reports on § 455 reflect a constant assumption that upon disqualification of a particular judge, another would be assigned to the case. For example:

> "[I]f there is [any] reasonable factual basis for doubting the judge's impartiality, he should disqualify himself *and let another judge preside over the case.*" S. Rep. No. 93–419, p. 5 (1973) (emphasis added); H. R. Rep. No. 93–1453, p. 5 (1973) (emphasis added).

The Reports of the two Houses continued:

> "The statutes contain ample authority for chief judges *to assign other judges* to replace either a circuit or district court judge who become disqualified [under § 455]." S. Rep. No. 93–419, *supra,* at 7 (emphasis added); H. R. Rep. No. 93–1453, *supra,* at 7 (emphasis added).

---

[19] In another, not unrelated context, Chief Justice Marshall's exposition in *Cohens* v. *Virginia,* 6 Wheat. 264 (1821), could well have been the explanation of the Rule of Necessity; he wrote that a court "must take jurisdiction if it˘ should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. *We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.* The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them." *Id.,* at 404 (emphasis added).

The congressional purpose so clearly expressed in the Reports gives no hint of altering the ancient Rule of Necessity, a doctrine that had not been questioned under prior judicial disqualification statutes.[20] The declared purpose of § 455 is to guarantee litigants a fair forum in which they can pursue their claims. Far from promoting this purpose, failure to apply the Rule of Necessity would have a contrary effect, for without the Rule, some litigants would be denied their right to a forum. The availability of a forum becomes especially important in these cases. As this Court has observed elsewhere, the Compensation Clause is designed to benefit, not the judges as individuals, but the public interest in a competent and independent judiciary. *Evans* v. *Gore, supra,* at 253. The public might be denied resolution of this crucial matter if first the District Judge, and now all the Justices of this Court, were to ignore the mandate of the Rule of Necessity and decline to answer the questions presented. On balance, the public interest would not be served by requiring disqualification under § 455.

We therefore hold that § 455 was not intended by Congress to alter the time-honored Rule of Necessity. And we would not casually infer that the Legislative and Executive Branches sought by the enactment of § 455 to foreclose federal courts from exercising "the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803).

### III

### *The Compensation Clause*

The Compensation Clause has its roots in the longstanding Anglo-American tradition of an independent Judiciary. A

---

[20] See Act of Mar. 3, 1911, ch. 231, §§ 20, 21, 36 Stat. 1090 (current version at 28 U. S. C. §§ 144, 455 (1976 ed. and Supp. III)). This statute applied only to district judges, but its existence demonstrates that the Rule of Necessity has continued in force side by side with statutory disqualification standards.

Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government. Our Constitution promotes that independence specifically by providing:

> "The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." Art. III, § 1.

Hamilton, in The Federalist No. 79, p. 491 (1818) (emphasis deleted), emphasized the importance of protecting judicial compensation:

> "In the general course of human nature, a power over a man's subsistence amounts to a power over his will."

The relationship of judges' compensation to their independence was by no means a new idea initiated by the authors of the Constitution. The Act of Settlement in 1701, designed to correct abuses prevalent under the reign of the Stuart Kings, includes a provision that, upon the accession of the successor to then Princess Anne,

> "Judges Commissions be made *Quamdiu se bene gesserint* [during good behavior], and their Salaries ascertained and established . . . ." 12 & 13 Will. III, ch. 2, § III, cl. 7 (1701).

This English statute is the earliest legislative acknowledgment that control over the tenure and compensation of judges is incompatible with a truly independent judiciary, free of improper influence from other forces within government. Later, Parliament passed, and the King assented to, a statute implementing the Act of Settlement providing that a judge's salary would not be decreased "so long as the Patents and Commissions of them, or any of them respectively, shall

continue and remain in force." 1 Geo. III, ch. 23, § III (1760). These two statutes were designed "to maintain both the dignity and independence of the judges." 1 W. Blackstone, Commentaries *267.

Originally, these same protections applied to colonial judges as well. In 1761, however, the King converted the tenure of colonial judges to service at his pleasure.[21] The interference this change brought to the administration of justice in the Colonies soon became one of the major objections voiced against the Crown. Indeed, the Declaration of Independence, in listing the grievances against the King, complained:

> "He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."

Independence won, the colonists did not forget the reasons that caused them to separate from the Mother Country. Thus, when the Framers met in Philadelphia in 1787 to draft our organic law, they made certain that in the judicial articles both the tenure and the compensation of judges would be protected from one of the evils that had brought on the Revolution and separation.

Madison's notes of the Constitutional Convention reveal that the draftsmen first reached a tentative arrangement whereby the Congress could neither increase nor decrease the compensation of judges. Later, Gouverneur Morris succeeded in striking the prohibition on increases; with others, he believed the Congress should be at liberty to raise salaries to meet such contingencies as inflation, a phenomenon known in that day as it is in ours. Madison opposed the change on the ground judges might tend to defer unduly to the Congress when that body was considering pay increases.

---

[21] See, e. g., W. Carpenter, Judicial Tenure in the United States 2–3 (1918).

The concern for the ravages of inflation is revealed in Madison's comment:

> "The variations in the value of money, may be guarded agst. by taking for a standard wheat or some other thing of permanent value. 2 M. Farrand, The Records of the Federal Convention of 1787, p. 45 (1911).

Morris criticized the proposal for overlooking changes in the state of the economy; the value of wheat may change, he said, and leave the judges undercompensated. The Convention finally adopted Morris' motion to allow increases by the Congress, thereby accepting a limited risk of external influence in order to accommodate the need to raise judges' salaries when times changed.[22] As Hamilton later explained:

> "It will readily be understood, that the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation [of judges] in the Constitution inadmissible. What might be extravagant to-day might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances; yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse." The Federalist No. 79, pp. 491–492 (1818).

This Court has recognized that the Compensation Clause

---

[22] The rejection of Madison's suggestion of tying judicial salaries to the price of some commodity may have arisen from colonial Virginia's unsatisfactory experience with a similar scheme for paying the clergy with a set amount of tobacco. See generally L. Gipson, The Coming of the Revolution, 1763–1775, pp. 46–54 (1954); Scott, The Constitutional Aspects of the "Parson's Cause," 31 Pol. Sci. Q. 558 (1916). Although ultimately the tobacco statutes and the subsequent cases are more important as indications of early dissatisfaction with the Crown, the widespread publicity surrounding them surely made the Framers wary of indexing salaries by reference to some commodity.

also serves another, related purpose. As well as promoting judicial independence, it ensures a prospective judge that, in abandoning private practice—more often than not more lucrative than the bench—the compensation of the new post will not diminish. Beyond doubt, such assurance has served to attract able lawyers to the bench and thereby enhances the quality of justice. *Evans* v. *Gore,* 253 U. S., at 253; 1 J. Kent, Commentaries on American Law 276 (1826).

## IV

The four statutes now before us present an issue never before addressed by this Court: when, if ever, does the Compensation Clause prohibit the Congress from repealing salary increases that otherwise take effect automatically pursuant to a formula previously enacted? We must decide when a salary increase authorized by Congress under such a formula "vests"—*i. e.,* becomes irreversible under the Compensation Clause. Is the protection of the Clause first invoked when the formula is *enacted* or when increases *take effect?*

## A

Appellees argue that we need not reach this constitutional question. They contend that Congress intended these four statutes do no more than halt *funding* for the salary increases under the Adjustment Act. If, as appellees contend, the statutes are appropriations measures that do not alter substantive law, the increases in all four years nevertheless are now in effect and the Government is obliged to pay them; it has simply to authorize that payment. Accordingly, appellees submit, these congressional actions violate the Compensation Clause regardless of whether Congress could have rescinded increases previously passed.

As a general rule, "repeals by implication are not favored." *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936). See also *TVA* v. *Hill,* 437 U. S. 153, 189 (1978), and *Morton* v. *Mancari,* 417 U. S. 535, 549 (1974). This rule applies

with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill. *TVA* v. *Hill, supra,* at 190. Indeed, the rules of both Houses limit the ability to change substantive law through appropriations measures. See Senate Standing Rule XVI (4); House of Representatives Rule XXI (2). Nevertheless, when Congress desires to suspend or repeal a statute in force, "[t]here can be no doubt that . . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise." *United States* v. *Dickerson,* 310 U. S. 554, 555 (1940). "The whole question depends on the intention of Congress as expressed in the statutes." *United States* v. *Mitchell,* 109 U. S. 146, 150 (1883). See also *Belknap* v. *United States,* 150 U. S. 588, 594 (1893).[23]

In the cases now before us, we conclude that in each of the four years in question Congress intended to repeal or postpone previously authorized increases. In the statute for Year 2, Congress expressly stated that the Adjustment Act increase due the following October "shall not take effect." Pub. L. 95–66, 91 Stat. 270. Thus, the plain words of the statute reveal an intention to repeal the Adjustment Act insofar as it would increase salaries in October 1977. This reading finds support in the House Report on the bill, which repeatedly uses language such as "eliminate the expected October 1977 comparability adjustment." See H. R. Rep. No. 95–458, pp. 1, 3 (1977). The floor remarks of Senators and Representatives confirm that this construction was generally understood.[24]

---

[23] Indeed, in both *Mitchell* and *Belknap,* the Court held that provisions in appropriations statutes funding certain officials' salaries at amounts below those established under previous statutes operated to repeal the relevant provisions of those statutes and set new salary levels.

[24] See, *e. g.,* 123 Cong. Rec. 7095 (1977) (remarks of Sen. Byrd) ("salaries . . . shall not be increased . . . thus obviat[ing] the effect of the comparability pay provisions"); *ibid.* (remarks of Sen. Baker) ("forgo and rescind that adjustment"); *id.,* at 21121 (remarks of Rep. Solarz)

The statutes in Years 1, 3, and 4, although phrased in terms of limiting funds, see *supra,* at 205–206, 207, 208, nevertheless were intended by Congress to block the increases the Adjustment Act otherwise would generate. Representative Shipley introduced the rider in relation to Year 1 to "preven[t] the automatic cost-of-living pay increase . . . ." 122 Cong. Rec. 28872 (1976).[25] Floor remarks in both Houses reflected this view.[26] In Year 3, the House Report characterized the statute as a "change [in] the application of existing law," H. R. Rep. No. 95–1254, p. 31 (1978), and described its effect as creating a one-year "pay freeze," *id.,* at 35. The Senate Re-

---

("knock[s] out the comparability increase for this year"); *id.,* at 21125 (remarks of Rep. Ammerman) ("deny the October 1 cost-of-living pay increase").

[25] Representative Shipley's original amendment applied only to Members of the House of Representatives. The provision was expanded to cover all officials subject to the Salary Act. See 122 Cong. Rec. 28877 (1976). The Senate Committee studying the bill recommended the provision be deleted altogether, see S. Rep. No. 94–1201, p. 2 (1976), but the Senate ultimately passed a version applying the freeze to all Members of Congress, see 122 Cong. Rec. 29132–29133 (1976). The Conference Committee recommended that the freeze apply to all Salary Act positions, see H. R. Conf. Rep. No. 94–1559, p. 3 (1976). This recommendation prevailed.

[26] See, *e. g.,* 122 Cong. Rec. 28865 (1976) (remarks of Rep. Armstrong) (a "freeze of the salaries"); *ibid.* (remarks of Rep. Yates) ("freeze the salaries"); *ibid.* (remarks of Rep. McClory) ("effectively eliminate the . . . cost-of-living increases"); *id.,* at 28870 (remarks of Rep. Derwinski) ("freezing . . . pay at its current level"); *id.,* at 28871 (remarks of Rep. Miller) ("stopping the pay raise"); *id.,* at 28879 (remarks of Rep. Anderson) ("block a cost-of-living pay increase"); *id.,* at 29132 (remarks of Sen. Taft) ("effectively freeze those salaries—the employees would not be given a cost-of-living raise on October 1, or a salary increase"); *id.,* at 29164 (remarks of Sen. Allen) ("freezing the compensation"); *id.,* at 29172 (remarks of Sen. Allen) ("denied the upcoming increase"; "salaries frozen at the September 30, 1976, level"); *id.,* at 29372 (remarks of Sen. Bartlett) ("automatic pay raises . . . eliminated"); *id.,* at 31892 (remarks of Rep. Shipley) ("no October cost-of-living increases would be made"; bill "proscribe[s] . . . the October cost-of-living pay increase[s]"); *id.,* at 31896 (remarks of Rep. Riegle) ("elimination of the cost-of-living raise").

port stated that the statute would "continu[e] . . . the so called 'cap' " on salaries for the next fiscal year. S. Rep. No. 95–1024, p. 50 (1978). Floor debate once again expressed agreement with this construction.[27] The House Report on the statute for Year 4 characterized it as "reduc[ing] Federal executive pay increases from the mandatory entitlement of 12.9 per centum to 5.5 per centum." H. R. Rep. No. 96–500, p. 7 (1979). The Report referred to the bill as a change in existing law. See *id.*, at 3. Later the Conference Report stated that the statute "restricts Cost-of-Living increases to 5.5 percent" for the fiscal year just begun. H. R. Conf. Rep. No. 96–513, p. 3 (1979). The floor debates also confirm this understanding.[28]

These passages indicate clearly that Congress intended to rescind these raises entirely, not simply to consign them to the fiscal limbo of an account due but not payable. The clear intent of Congress in each year was to stop for that year the application of the Adjustment Act. The issue thus resolves itself into whether Congress could do so without violating the Compensation Clause.

## B

### *Year 1*

The statute applying to Year 1 was signed by the President during the business day of October 1, 1976. By that time, the 4.8% increase under the Adjustment Act already had

[27] See, *e. g.,* 124 Cong. Rec. 17603 (1978) (remarks of Rep. Shipley) ("pay freeze"); *id.,* at 17604 (remarks of Rep. Armstrong) ("automatic cost-of-living increases will not be permitted"); *id.,* at 24375 (remarks of Sen. Sasser) ("freeze, during fiscal year 1979, the pay").

[28] See, *e. g.,* 125 Cong. Rec. 27532 (1979) (remarks of Rep. Whitten) ("sharply decreas[es] such automatic increases"); *id.,* at 27533 (remarks of Rep. Jacobs) ("rollback of the automatic 12.9-percent salary increase"); *id.,* at 28019 (remarks of Sen. Byrd) ("put a cap on that pay increase"); *id.,* at 28020 (remarks of Sen. Magnuson) ("this is in the nature of a cap, a limitation"); *id.,* at 28108 (remarks of Rep. Conte) ("reduces from 12.9 to 5.5 percent the increase in pay").

taken effect, since it was operative with the start of the month—and the new fiscal year—at the beginning of the day. The statute became law only upon the President's signing it on October 1; it therefore purported to repeal a salary increase already in force. Thus it "diminished" the compensation of federal judges.[29]

---

[29] The Government asks us to invoke the rule that the law does not recognize fractions of a day, see, *e. g., Lapeyre* v. *United States,* 17 Wall. 191 (1873); it is argued that we should treat the President's assent as having been given at the start of October 1, the same time the Year 1 increase was to take effect. It is correct that "the law generally reject[s] all fractions of a day, in order to avoid disputes." 2 W. Blackstone, Commentaries *141. Here, however, the Government acknowledges that the statute was signed by the President *after* the Year 1 increase had taken effect. This Court, almost a century ago, stated:

" '[W]henever it becomes important to the ends of justice, or in order to decide upon conflicting interests, the law will look into fractions of a day, as readily as into the fractions of any other unit of time. The rule is purely one of convenience, which must give way whenever the rights of parties require it. . . . The law is not made of such unreasonable and arbitrary rules.' " *Louisville* v. *Savings Bank,* 104 U. S. 469, 474–475 (1881) (quoting *Grosvenor* v. *Magill,* 37 Ill. 239, 240–241 (1865); citations omitted).

Accord, *Combe* v. *Pitt,* 3 Burr. 1423, 97 Eng. Rep. 907 (K. B. 1763); 2 C. Sands, Sutherland on Statutory Construction § 33.10 (4th ed. 1973).

In *Burgess* v. *Salmon,* 97 U. S. 381 (1878), this Court was required to look to the time of day when a statute was enacted as compared to another and related event. This Court held that, notwithstanding the general rule, a person could not be subjected to a civil fine for violating a statute passed on the same day he engaged in the conduct but after that conduct had occurred. To impose a penalty on an act innocent when performed would render the statute an *ex post facto* law. *Id.,* at 384–385. Thus *Burgess* dealt not so much with benefits and penalties as it did with constitutional limitations on the legislative authority of Congress and the Executive. In the context of periodic increases, the Compensation Clause, like the *Ex Post Facto* Clause of Art. I, § 9, places limits on Congress and the President. Because of the constitutional implications, the logic of *Burgess* applies to the statute for Year 1 and requires us to look to the precise time the statute became law by the President's action.

The Government contends that Congress could reduce compensation as long as it did not "discriminate" against judges, as such, during the process. That the "freeze" applied to various officials in the Legislative and the Executive Branches, as well as judges, does not save the statute, however. This is quite different from the situation in *O'Malley* v. *Woodrough*, 307 U. S. 277 (1939). There the Court held that the Compensation Clause was not offended by an income tax levied on Article III judges as well as on all other taxpayers; there was no discrimination against the plaintiff judge. Federal judges, like all citizens, must share "the material burden of the government . . . ." *Id.*, at 282. The inclusion in the freeze of other officials who are not protected by the Compensation Clause does not insulate a direct diminution in judges' salaries from the clear mandate of that Clause; the Constitution makes no exceptions for "nondiscriminatory" reductions.[30] Accordingly, we hold that the statute with respect to Year 1, as applied to compensation of members of the certified class, violates the Compensation Clause of Art. III.

## Year 2

Unlike the statute for Year 1, the statute for Year 2 was signed by the President before October 1, when the 7.1% raise under the Comparability Act was due to take effect. Year 2 thus confronts us squarely with the question of whether Congress may, before the effective date of a salary increase, rescind such an increase scheduled to take effect at a later date. The District Court held that by including an annual cost-of-living adjustment in the statutory definitions of the salaries of Article III judges, see *supra*, at 204, and n. 2, Congress made the annual adjustment, from that moment on,

---

[30] We need not address the question of whether evidence of an intent to influence the Judiciary would invalidate a statute that on its face does not directly reduce judicial compensation. See *Evans* v. *Gore*, 253 U. S. 245, 252 (1920).

a part of judges' compensation for constitutional purposes. Subsequent action reducing those adjustments "diminishes" compensation within the meaning of the Compensation Clause. Relying on *Evans* v. *Gore,* 253 U. S., at 254, the District Court held that such action reduces the amount "a judge . . . has been promised," and all amounts thus promised fall within the protection of the Clause.

We are unable to agree with the District Court's analysis and result. Our discussion of the Framers' debates over the Compensation Clause, *supra,* at 219–220, led to a conclusion that the Compensation Clause does not erect an absolute ban on all legislation that conceivably could have an adverse effect on compensation of judges.[31] Rather, that provision embodies a clear rule prohibiting decreases but allowing increases, a practical balancing by the Framers of the need to increase compensation to meet economic changes, such as substantial inflation, against the need for judges to be free from undue congressional influence. The Constitution delegated to Congress the discretion to fix salaries and of necessity placed faith in the integrity and sound judgment of the elected representatives to enact increases when changing conditions demand.

Congress enacted the Adjustment Act based on this delegated power to fix and, periodically, increase judicial compensation. It did not thereby alter the *compensation* of judges; it modified only the *formula* for determining that compensation. Later, Congress decided to abandon the for-

---

[31] In *O'Malley* v. *Woodrough,* 307 U. S. 277 (1939), this Court held that the immunity in the Compensation Clause would not extend to exempting judges from paying taxes, a duty shared by all citizens. The Court thus recognized that the Compensation Clause does not forbid everything that might adversely affect judges. The opinion concluded by saying that to the extent *Miles* v. *Graham,* 268 U. S. 501 (1925), was inconsistent, it "cannot survive." 307 U. S., at 282–283. Because *Miles* relied on *Evans* v. *Gore, O'Malley* must also be read to undermine the reasoning of *Evans,* on which the District Court relied in reaching its decision.

mula as to the particular years in question. For Year 2, as opposed to Year 1, the statute was passed before the Adjustment Act increases had taken effect—before they had become a part of the compensation due Article III judges. Thus, the departure from the Adjustment Act policy in no sense diminished the compensation Article III judges were receiving; it refused only to apply a previously enacted formula.[32]

A paramount—indeed, an indispensable—ingredient of the concept of powers delegated to coequal branches is that each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches. To say that the Congress could not alter a method of calculating salaries before it was executed would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Congress.[33] We therefore conclude

---

[32] *United States* v. *More* (CC DC 1803), writ of error dism'd for want of jurisdiction, 3 Cranch 159 (1805), is not to the contrary. Congress had enacted a system of fees for compensating justices of the peace in the District of Columbia but subsequently abolished the fees. The Government brought an indictment against a justice of the peace who had continued to charge the fees, and the defendant demurred. The Circuit Court for the District of Columbia held that the compensation of justices of the peace in the District of Columbia was subject to the Compensation Clause and that a statute diminishing (here, abolishing) the fees violated the Constitution. *Id.*, at 161, n. In *More,* the fee system was already in place as part of the justices' compensation when Congress repealed it. Here, by contrast, the increase in Year 2 had not yet become part of the compensation of Article III judges when the statute repealing it was passed and signed by the President.

[33] Indeed, it would be particularly ironic if we were to bind Congress to an indexing scheme for salaries when the Framers themselves rejected an indexing proposal. See *supra,* at 220. Of course, indexing techniques have improved since 1787. Nevertheless, Congress' repeated rejections of specific adjustments indicates some dissatisfaction with automatic adjustments according to a predetermined formula, even if not with the formula itself.

that a salary increase "vests" for purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges. With regard to Year 2, we hold that the Compensation Clause did not prohibit Congress from repealing the planned but not yet effective cost-of-living adjustment of October 1, 1977, when it did so before October 1, the time it first was scheduled to become part of judges' compensation. The statute in Year 2 thus represents a constitutionally valid exercise of legislative authority.

## Year 3

For our purposes, the legal issues presented by the statute in Year 3 are indistinguishable from those in Year 2. Each statute eliminated—before October 1—the Adjustment Act salary increases contemplated but not yet implemented. Each statute was passed and signed by the President *before* the Adjustment Act increases took effect, in; the case of Year 3, on September 30. For the reasons set forth in our discussion of the issues for Year 2, we hold that the statute in Year 3 did not violate the Compensation Clause.

## Year 4

Before reaching the constitutional issues implicated in Year 4, we must resolve a problem of statutory construction. On its face, the statute in Year 4 applies in terms to "executive employees, which includes Members of Congress." See *supra,* at 208. It does not expressly mention judges. Appellees contend that even if Congress constitutionally could freeze the salaries of Article III judges, it did not do so in this statute.

We are satisfied that Congress' use of the phrase "executive employees," in context, was intended to include Article III judges. The full title of the Adjustment Act is the *Executive* Salary Cost-of-Living Adjustment Act, but it is clear that it was intended to apply to officials in the Legislative and the

Judicial Branches as well.[34] The title does not control over the terms of the statute. The statutes in the three preceding years undeniably applied to judges, and we can discern no indication that the Congress chose to single them out for an exemption when it was including Executive and Legislative officials. Most important, both the Conference Report and the Chairman of the House Appropriations Committee, speaking on the floor, made explicit what already was implicit: the limiting statute would apply to judges as well. See H. R. Conf. Rep. No. 96–513, p. 3 (1979); 125 Cong. Rec. 27530, 27532 (1979) (remarks of Rep. Whitten).[35]

Having concluded that the statute in Year 4 was intended to apply to judges as well as other high-level federal officials, we are confronted with a situation similar to that in Year 1. Here again, the statute purported to revoke an increase in judges' compensation *after* those statutes had taken effect. For the reasons governing the statute as to Year 1, we hold that the statute revoking the increase for Year 4 violated the Compensation Clause insofar as it applied to members of the certified class.

## V

The District Court has not yet calculated the precise dollar amounts involved in Years 1 and 4, the years in which we hold the statutes violated the Compensation Clause. Further proceedings are required to resolve these questions. Accordingly, the judgment of the District Court in No. 79–983

[34] Most positions covered, of course, are in the Executive Branch, which may explain the limited title.

[35] Several Members of Congress acknowledged the potential constitutional problem with rolling back the salary increase already in effect for judges. See 125 Cong. Rec. 27529–27530 (1979) (remarks of Rep. Latta); *id.*, at 27531–27533 (remarks of Rep. Whitten); *id.*, at 27533 (remarks of Rep. Jacobs); *id.*, at 28022 (remarks of Sen. Stevens). Representative Whitten, the Chairman of the House Appropriations Committee, stated that "the courts will have to make a final determination regarding this issue." *Id.*, at 27532.

is affirmed in part and reversed in part, the judgment in No. 79–1689 is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN took no part in the decision of these cases.