# Proposed Constitutional Amendment to Limit the Tenure of Judges

A proposed constitutional amendment to limit the tenure of judges to a term, subject to reconfirmation, is antagonistic to the overall structural design of the Constitution.

The present guarantee of judicial tenure "during good Behaviour," U.S. Const. art. III, § 1, is necessary to secure independence and impartiality. Judges limited by term and subject to reappointment will be unacceptably dependent upon the political branch exercising the power of appointment.

Under the specific proposal the appointing authority would be the Senate, thereby frustrating the present delicate balance between the legislative and executive branches that exists with respect to judicial appointments.

January 18, 1984

LETTER TO THE CHAIRMAN, SENATE COMMITTEE ON THE JUDICIARY

This responds to your request for the views of the Department of Justice on S.J. Res. 39, 98th Cong., 1st Sess., which would propose a constitutional amendment pursuant to which federal judges would be appointed for a term of office of ten years and hold office for that term during good behavior. The bill would provide that:

> During the tenth year of each term of office of any such judge, his nomination for an additional term of office for that judgeship shall be placed before the Senate for its advice and consent to such additional term, unless that judge requests that his nomination not be so placed. Any judge whose nomination for an additional term of office is so placed may remain in office until the Senate gives its advice and consent to, or rejects, such nomination.

Although the proposal is not explicit as to the manner in which a judge's nomination is to be placed before the Senate, the implication to be drawn from the language of the resolution is that, unless the judge requests that his name not be considered, the nomination is submitted to the Senate automatically by a procedure not involving the President.[1]

---

[1] Under the Constitution, the President's functions are, with a few exceptions, discretionary rather than ministerial. We therefore do not interpret the proposal as intending to impose on the President a ministerial duty to renominate a judge whose term is about to expire.

1

In commenting on the proposed amendment, the Department of Justice acknowledges that Article V of the Constitution assigns to Congress the responsibility for proposing constitutional amendments to the States and that the Executive branch has no direct role in this process, in particular that joint resolutions of this variety are not subject to the veto power of the President, *Hollingsworth* v. *Virginia*, 3 U.S. (3 Dall.) 378 (1798). Nonetheless, you have asked for the views of the Department of Justice, and we set them forth in this letter.

The Department of Justice strongly opposes the proposed amendment. The constitutional requirement "that the judges, both of the supreme and inferior Courts shall hold their Offices during good Behaviour," U.S. Const. art. III, § 1, is one of the cornerstones of the constitutional plan for the independence of the Judicial Branch and therefore of the separation of powers, the basic structural doctrine of the Constitution. *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

In *The Federalist* No. 78, Alexander Hamilton stated:

> The standard of good behavior for the continuance in office of the judicial magistracy is certainly one of the most valuable of the modern improvements in the practice of government. In a monarchy it is an excellent barrier to the despotism of the prince; in a republic it is a no less excellent barrier to the encroachments and oppressions of the representative body. And it is the best expedient which can be devised in any government to secure a steady, upright, and impartial administration of the laws.

*The Federalist* No. 78, at 465 (A. Hamilton) (C. Rossiter ed. 1961).[2]

During the last decade Congress, including your Committee, conducted extensive and searching inquiries into the crucial interrelationship between the independence of the judiciary and the provision in Article III for judicial tenure during good behavior terminable only by impeachment proceedings. The issue arose in connection with legislative proposals to provide in judicial proceedings for the removal or the involuntary retirement of judges who had allegedly violated the good behavior requirement or who had become incapacitated. Senators and Representatives of both political parties considered this proposal so serious a threat to the independence of the judiciary that it was ultimately abandoned and replaced by the disciplinary provisions of § 3 of the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, 94 Stat. 2036 (codified at 28 U.S.C. § 372(c)).[3]

---

[2] In *Toth* v. *Quarles*, 355 U.S. 11, 16 (1955), the Supreme Court stated: "The provisions of Article III [of the Constitution, which include the Good Behavior Clause] were designed to give judges maximum freedom from possible coercion or influence by the executive or legislative branches of the Government." *See generally United States* v. *Will*, 449 U.S. 200, 217–19 (1980); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

[3] S. Rep. No. 362, 96th Cong., 1st Sess. 4–7, 23, 29–30 (1979); H.R. Rep. No. 1313, 96th Cong. 2d Sess. 1–5, 16–19 (1980); *Hearings on the Independence of Federal Judges before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary*, 91st Cong. 2d Sess. 329–51 (1970); *Hearings on Judicial Tenure and Discipline 1979–1980, before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary*, 96th Cong., 1st & 2d Sess. (1980).

For example, Senator Laxalt stated his view that even 28 U.S.C. § 372(c) as ultimately enacted went too far in impinging on judicial independence. He stated:

> Lifetime appointment and a slow and cumbersome system of impeachment have insured us of a Federal judiciary which remains free and independent, and has helped to assure us that cases are decided on their merits and on the law. Where unpopular decisions are warranted by the law, as they often are, a judge may render such a decision knowing that he will be free of pressure from the public, from the press, and from the rest of the judiciary. We are assured, in short, that the case will be decided as it should be, and according to law.
>
> The Federal Courts are the final link in our system of checks and balances. They are the last to act, and the last to change. After the legislature and the executive branches have acted, after the press has analyzed, reported and commented, and even after the public has experienced changes and additions to our system and to our laws, the courts finally rule on the legality, the constitutionality, the application, and the scope of those changes and laws. That review follows the debate on the need for and the advisability of such changes with good cause. Making that process more susceptible to political pressure will not, in my opinion, improve our system of Government.

S. Rep. No. 362, 96th Cong., 1st Sess. 29 (1979).

Proposals to appoint judges for terms of years "to make their decisions conform to the will of the people" are not new.[4] A century-and-a-half ago Justice Story felt it necessary to demonstrate that the appointment of judges for terms of years would not have the effect of subjecting their decisions to the "will of the people" but rather would make judges subservient to the political branches of the Government, and make the meaning of the Constitution dependent on every biennial or quadrennial election rather than on the judges' deliberate judgment. 2 J. Story, *Commentaries on the Constitution of the United States*, §§ 1613–1621 (5th ed. 1891).

The following passages are representative of Justice Story's discussion:

> If the judges are appointed at short intervals, either by the legislative or the executive department, they will naturally, and, indeed, almost necessarily, become mere dependents upon the appointing power. If they have any desire to obtain, or to hold office, they will at all times evince a desire to follow and obey the will of the predominant power in the state. Public justice will be administered with a faltering and feeble hand. . . . It will decree what best suits the opinions of the day, and it will forget that the precepts of the law rest on eternal foundations.

---

[4] *See* 2 J. Story, *Commentaries on the Constitution of the United States*, § 1615 (5th ed. 1891). The first edition of the *Commentaries* was published in 1833.

3

* * *

If the will of the people is to govern in the construction of the powers of the constitution, and that will is to be gathered at every successive election at the polls, and not from their deliberate judgment, and solemn acts in ratifying the Constitution, or in amending it, what certainty can there be in those powers? If the Constitution is to be expounded, not by its written text, but by the opinions of the rulers for the time being, whose opinions are to prevail, the first, or the last? When, therefore, it is said that the judges ought to be subjected to the will of the people, and to conform to their interpretation of the Constitution, the practical meaning must be, that they should be subjected to the control of the representatives of the people in the executive and legislative departments, and should interpret the Constitution as the latter may, from time to time, deem correct.

*Id.* §§ 1613, 1616. The logic of Justice Story's analysis is still valid. If judges are appointed for a definite term subject to reappointment, it is inevitable that at least some of them will seek to avoid offending those who have the power to block their reappointment. It would, of course, be possible to guard against that danger by providing that judges would be ineligible for reappointment. In that event, however, many lawyers, although highly qualified to become judges, might be reluctant to give up their practice for a temporary judicial appointment, and even among those who do, some may be suspected toward the end of their term of seeking to curry favor with those who may be of assistance to them in reentering private practice. *See The Federalist* No. 78, supra, at 471.

For the foregoing reasons, and without intending to foreclose further congressional consideration of the good behavior issue or the entirely separate issue of "judicial restraint," the Department of Justice is in principle opposed to the abolition of tenure during good behavior for the federal judiciary as contemplated by S.J. Res. 39. Two significant aspects of S.J. Res. 39 which aggravate the harm connected with the abolition of such tenure require additional comment.

First, as we understand the proposal, the renomination of a judge whose term has expired would come automatically before the Senate, and if the Senate were to give its advice and consent to the additional term, the term would be automatically extended. The President would take no part in the processes of nomination and appointment; he would not have the power to refuse to renominate a judge or to deny reappointment to a judge to whose reappointment the Senate has given its advice and consent. The reappointment process thus would be under the exclusive control of the Senate. The Department of Justice strenuously objects to this aspect of the joint resolution, because it is in conflict with the constitutional plan embodied in Article II, § 2 of the Constitution, pursuant to which the nomination and appointment of federal officers are the *discretionary* acts of the President, even if as regards certain officers the latter can be performed only with the advice and consent of the Senate. *Marbury* v.

4

*Madison*, 5 U.S. (1 Cranch) 137, 155 (1803). We are not aware why this rule should not apply to the reappointment of judges. Indeed, this aspect of the joint resolution accentuates the objections to the provisions giving judges terms of years, because it makes judges dependent exclusively on the Senate for their reappointment. This alters the constitutional plan of checks and balances and tilts the scale toward one branch, the Legislative, and away from the Judiciary and the President.

Second, the joint resolution would provide that when a nomination for an additional term is placed before the Senate, the judge "may remain in office until the Senate gives its advice and consent to, or rejects, such nomination." By refusing to take any action on the renomination, the Senate, or indeed a Committee of the Senate or, under Senate practice relating to confirmations, initially one Senator,[5] can place the judge in a position for an indefinite period in which he or she can be ousted at any time for any decision which may displease the Senate. To have such a sword of Damocles hang over a judge is totally inconsistent with our constitutional system of three separate branches "entirely free from the control or coercive influence direct or indirect of either of the others." *Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935). As the Court held in that case: "[I]t is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 629.

We should not forget that one of the charges against King George III in the Declaration of Independence was:

> He has made Judges dependent on his Will alone for the tenure
> of their offices, and the amount and payment of their salaries.

The Department of Justice therefore opposes the proposed constitutional amendment.

The Office of Management and Budget has advised that it has no objection to the submission of this report from the standpoint of the Administration's program.

ROBERT A. MCCONNELL
*Assistant Attorney General*
*Office of Legislative Affairs**

---

[5] In *The Changing Role of the Senate Judiciary Committee on Judicial Selection*, 62 Judicature 502, 504–05 (1979), Professor Slotnick documents the fact that, under the "Blue Slip" procedure, a single Senator of the nominee's home state may prevent the scheduling of the hearing and consequently the advice and consent of the Senate on a Presidential nominee. *See also Slotnick, Reforms in Judicial Selection: Will They Affect the Senate's Role?*, 64 Judicature 60, 62–63 (1980). This process is also described in Adams and Kavanagh-Baran, *Promise and Performance: Carter Builds a New Administration* 111–13 (1979). Thus, a single Senator could utilize current practices to keep a judge's reconfirmation in suspense for an indefinite period of time.

* NOTE: This letter was drafted by the Office of Legal Counsel for the signature of the Assistant Attorney General for the Office of Legislative Affairs.