William E. FOLEY, Plaintiff,

v.

James Earl CARTER, Defendant.

Civ. A. No. 79–3063.

United States District Court,
District of Columbia.

Nov. 16, 1981.

978

Robert S. Erdahl, Washington, D. C., for plaintiff.

Neil H. Koslowe, Civ. Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., Chief Judge.

William E. Foley, Director of the Administrative Office of the United States Courts, originally brought this action in November of 1979 against President Jimmy Carter seeking mandamus and declaratory relief. This Court granted plaintiff Foley summary judgment on March 24, 1980, holding as a matter of statutory construction that the "cap" of 5.5% imposed by section 101(c) of Public Law 96–86 in lieu of the 12.9% increase in salaries due on October 1, 1979, for officials covered by the Adjustment Act did not apply to the Judicial Branch. *Foley v. Carter*, No. 79–3063 (D.D.C. March 24, 1980) at 11.[1] Upon appeal, the Court of Appeals elected to certify certain questions of law to the Supreme Court, holding all motions filed in abeyance. While these questions were pending before the Supreme Court, that court filed its opinion and judgment in *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).[2] In light of its disposition of the *Will* cases, the Supreme Court declined to consider the questions certified by the Court of Appeals in these cases. Accordingly, on May 20, 1981, the Court of Appeals for this Circuit entered a *per curiam* order dismissing these appeals "insofar as they pertain to Article III judges," and with respect to all other issues, remanding the cases to this Court "for further consideration in light of the decision by the Supreme Court in the *Will* cases." Thereafter, several more motions were filed in the Court of Appeals by the parties, seeking modification or reconsideration of the May 20, 1981 order. By a separate order dated August 21, 1981, the Court of Appeals vacated the earlier order. Denying the President's motion for entry of a *Munsingwear* order, the Court of Appeals again ordered that the judgment of the District Court "is vacated insofar as it adjudicated claims of Article III judges who have now received the salary increases at issue, and the case is remanded to the District Court for further consideration in light of *Will, et al. v. United States* . . . ." The Court of Appeals' August 21, 1981 order noted that several motions filed in that Court remained to be decided, yet in its

---

1. The Court also granted plaintiff declaratory relief, holding that the President had an affirmative duty to specify, in accord with 5 U.S.C. § 5305(c)(1), the overall percentage of adjustment in the rate of pay under the General Schedule (GS). *Foley v. Carter*, No. 79–3063 at 9. The President did specify the overall percentage as 7.02 in a message to Congress on March 13, 1980. 16 Weekly Comp. of Pres. Doc. 408 (1980). Both sides agree that this is no longer at issue.

2. This case consolidated appeals taken by the Government on two actions brought by thirteen United States District Court judges in the United States District Court for the Northern District of Illinois. 447 U.S. 919, 100 S.Ct. 3008, 65 L.Ed.2d 1111 (1980). The first of these cases challenged the validity of statutes in fiscal years 1977 and 1978 under the Compensation Clause, and the second challenged the validity of similar statutes in fiscal years 1979 and 1980. *See* 449 U.S. at 209–10, 101 S.Ct. at 477–478.

accompanying memorandum the Court of Appeals declined to address those issues until they had been aired before and resolved by this Court. Plaintiff Foley has since filed a memorandum pursuant to the mandate of the Court of Appeals, defendant Reagan (the President) has filed a second motion for summary judgment and plaintiff has responded.

From the outset, the central issue in these cases has been the constitutional applicability to the Judicial Branch of section 101(c) of Public Law 96–86, 93 Stat. 657, enacted October 12, 1979, which purported to reduce to 5.5% the 12.9% adjustment in salaries which had accrued October 1, 1979, or October 8, 1979, to certain officials of the Judicial Branch under the Executive Cost-of-Living Adjustment Act, Public Law 94–82, 89 Stat. 419 (codified at 28 U.S.C. § 461 (1976)) (the Adjustment Act), and related provisions of law. The intricacies of the complex, interlocking statutory mechanism which fixes the compensation of high-level Executive, Legislative and Judicial officials can be summarized for purposes here. The salaries of high-level officials of all three Branches are initially set under the Postal Revenue and Federal Salary Act of 1967, 2 U.S.C. §§ 351–61 (the Salary Act). The Salary Act provides for a quadrennial review of these officials' salaries beginning in 1969. In addition, the Adjustment Act, passed in 1975, subjects the salaries covered by the Salary Act to the same annual adjustment made in the General Schedule under the Federal Pay Comparability Act of 1970, 5 U.S.C. §§ 5305–06 (the Comparability Act). Under subsection 5305(a) of this Act, the President has discretion, following consideration of the report of an appointed pay agent and the advice of the Advisory Committee on Federal Pay, to adjust the GS rates pursuant to the principles of comparability found in subsection 5301(a), or, if he determines that because of a national emergency or economic condition affecting the general welfare it would be inappropriate in any year to make the adjustment required under subsection 5305(a), then he is directed to prepare and submit to Congress an "alternative plan" under subsection 5305(c). This alternative plan must be submitted before September 1, 5 U.S.C. § 5305(c)(1), and becomes effective on the first day of the applicable pay period beginning on or after October 1 unless Congress disapproves the plan within thirty days after it is transmitted, in which case the pay adjustments originally recommended to the President become effective, 5 U.S.C. § 5305(c)(2).

The controversy in the instant case centers on the operation of these statutes during fiscal year 1980 (October 1, 1979 through September 20, 1980), during which Public Law 96–86 was operative. On August 31, 1979, acting under section 5305(c) of the Comparability Act, the President submitted to Congress an alternative plan for a proposed cost-of-living increase for federal employees for fiscal year 1980. This alternative plan limited adjustments to a 7% increase at each grade in lieu of the 10.41% increase recommended by the appointed pay agent. 15 Weekly Comp. of Pres.Doc. 1530 (Aug. 30, 1979). Neither House of Congress disapproved the alternative plan within thirty days of its transmission, thus it automatically became effective. As a result, on October 1, 1979, all Article III judges became entitled to increases of about 12.9%. See 449 U.S. at 208, 101 S.Ct. at 477.[3] Also on October 1, 1979, bankruptcy judges and magistrates were entitled to

---

**3.** Of this increase 5.5% derives from the amount due federal employees pursuant to the adjustments of the GS during October of 1978, see 28 U.S.C. § 461, which was not paid during the fiscal year 1979 because of a prohibition in section 304(a) of the Legislative Branch Appropriations Act of 1979, P.L. 95–391, 92 Stat. 763. With the close of fiscal year 1979, this prohibition expired and the pertinent federal employees automatically became entitled to the 5.5% increase. That increase, when compounded with the 7.2% increase for fiscal year 1980, brought the total to 12.9%.

Territorial judges and trial judges of the Court of Claims are among other members of the Judiciary entitled to Adjustment Act increases. See Pay Order 80–1, 45 Fed.Reg. 32355–57 (May 16, 1980).

Adjustment Act increases of 7.02%.[4] Other non-Article III officials of the Judiciary, including Circuit Executives and Clerks of Court, became entitled to the 5.5% increase for fiscal year 1979 on October 1, 1979, and to an additional 7.02% increase as of October 8, 1979.[5] On October 12, 1979, however, the President signed Public Law 96–86, which limited salary increases for certain officials to be paid with funds appropriated for fiscal year 1980 to 5.5%. The second paragraph of Public Law 96–86, section 101(c), provided:

> For the fiscal year 1980, funds available for payment to executive employees, which includes Members of Congress, who under existing law are entitled to approximately 12.9 percent increase in pay, shall not be used to pay any such employee or elected or appointed official any sum in excess of 5.5 percent increase in existing pay and such sum if accepted shall be in lieu of the 12.9 percent due for such fiscal year.

On November 15, 1979, President Carter, through the Office of Personnel Management, issued two bulletins, Bulletin 534–5 relating to the Executive Pay Schedule, and Bulletin 531–80 relating to the General Schedule, both of which gave retroactive effect to Public Law 96–86, readjusting the payable rates for all salary systems retroactively to October 1, 1979, and nullifying the cost-of-living increases effective and payable for the period from October 1 through October 11, 1979.

The Supreme Court held in *Will* that Adjustment Act increases take effect at the start of the first pay period of the fiscal year, 449 U.S. at 204, 205, 101 S.Ct. at 475–476; that section 101(c) of Public Law 96–86 was intended to apply to judges as well as to officials of the other two Branches, *id.* at 230, 101 S.Ct. at 488; and that, as applied to Article III judges Public Law 96–86 violated the Compensation Clause, *id.* at 210 n.8, 230, 101 S.Ct. at 478 n.8, 488. *Will* did not address the effect of these provisions of law on the pay of non-Article III judicial officials. Plaintiff continues to press his claim before this Court that some 870 non-Article III members of the Judicial Branch were unconstitutionally deprived of pay increases due them under the Adjustment Act.

## I.

The parties are agreed that section 101(c) of Public Law 96–86 did apply to all members of the Judicial Branch, to non-Article III officials as well as to Article III judges.[6] Nevertheless, the President argues that no justiciable controversy remains in this case because Public Law 96–86 expired by its terms at the end of fiscal year 1980, on September 30, 1980. Moreover, he contends that Foley has no standing to seek a declaratory judgment concerning the constitutional application of Public Law 96–86 to non-Article III members of the Judicial Branch, because Foley cannot demonstrate any injury to himself from such application, nor has he been authorized to seek declara-

---

**4.** The salaries of bankruptcy judges were established by section 411 of Public Law 95–598, 92 Stat. 2688. Public Law 95–598, passed November 6, 1978, raised the salary of bankruptcy judges to $50,000 and, as of that date, superceded all prior rates, § 404(d), Pub.L.No.95–598, including the 5.5% adjustment effective October 1, 1978, but not paid during fiscal year 1979. Thus, these judges were due only the 7.02% increase. Since they are paid on the first of every month, this increase was effective for them on October 1, 1979. *See* 28 U.S.C. § 461(a).

Similarly, all magistrates, whose pay is fixed by the Judicial Conference pursuant to 28 U.S.C. § 634(a) "not to exceed the rates now or hereafter provided for ... referees in bankrupt-

cy [i. e. bankruptcy judges] ...," were entitled by the Adjustment Act to the 7.02% increase on October 1, 1979.

**5.** These officials are paid biweekly. The first day of their "first applicable pay period" of fiscal year 1980 was October 8, 1979, and Adjustment Act increases became effective for them on that date. *See* 28 U.S.C. § 461(a).

**6.** The parties draw this conclusion from the language and reasoning of the *Will* decision, although that case dealt only with the rights of Article III judges under the Compensation Clause, 449 U.S. at 229–30, 101 S.Ct. at 487–488. The Court takes no exception to this interpretation.

tory relief on behalf of anybody else who may have suffered such injury.

With regard to the claim that plaintiff Foley has not suffered actual or threatened injury so as to have standing, this Court noted previously that Foley, as Director of the Administrative Office of the United States Courts, is under a duty to "disburse directly or through the several United States marshals, moneys appropriated for the maintenance and operation of the courts," 28 U.S.C. § 604(a)(8), including payment of appropriate salaries, certain of which are adjusted annually under the Adjustment Act. *Will* held that it was the intent of Congress in section 101(c) of Public Law 96–86 to "stop for that year [fiscal year 1980] the application of the Adjustment Act." 449 U.S. at 224, 101 S.Ct. at 485. As was the situation before *Will* and is still the situation now with regard to non-Article III judicial officials, Foley cannot calculate the rate of adjustment for the pay schedules of these officials for the fiscal year 1980 until he knows whether Public Law 96–86 is lawfully applicable to them.[7]

The expiration of Public Law 96–86 on September 30, 1980, in no way solved Foley's dilemma with regard to the increase to be paid for fiscal year 1980. In order not to invoke the forfeiture provision of section 101(c), Foley withheld all increases in pay during fiscal year 1980 from all of the officials to whom Public Law 96–86 might apply.[8] To date these officials have accepted no increase for fiscal year 1980, and it appears that funds to pay the full increases are still available.[9]

■ Thus, regardless of the expiration of Public Law 96–86, this Court finds plaintiff Foley faced with essentially the same dilemma with which he was faced when he filed his complaint two years ago, except that *Will* settled the rights of Article III judges. On the one hand, the Director faces constitutional challenge from non-Article III judicial officials for disbursing anything less than the full amount of the increases that became effective at the start of fiscal year 1980; on the other hand he faces legal action by the Executive Branch under the Anti-Deficiency Act, 31 U.S.C. § 665(a), should he make adjustments for those offi-

7. In addition to salary adjustments that remain to be made, the Director must also take deductions for and pay benefits from various annuities, group insurance, retirement and disability funds, which are in turn dependent upon the salaries paid to the officials involved.

8. On February 9, 1981, Foley notified non-Article III officials from whom he had withheld increases that, since Public Law 96–86 and its forfeiture provision expired by its terms on September 30, 1980, it was his belief that, under any construction of that statute, at least the 5.5% increase it permitted became payable without danger of forfeiture of a greater increase after September 30, 1980. Accordingly, he adjusted the salaries of the affected officials prospectively and retroactively to October 1, 1980, to reflect that increase.

9. At this point the Court must accept Foley's assertion that fiscal year 1980 appropriated funds are still available to pay non-Article III judicial officials the full pay increase available to them under the Adjustment Act for 1980. Foley did "reserve" administratively $4,617,000 in 1980 funds transferred to salary accounts by the Supplemental Appropriations and Rescission Act, 1980 (SAR Act), under authority of section 665(c)(2) of Title 31. Foley maintains that his reservation of those funds constitutes

an "obligation," recorded under section 200(a) of Title 31 as a "liability which may result from pending litigation brought under authority of law," the expenditure of which is allowed even after the time period for which the reserves were originally appropriated. 31 U.S.C. § 200(d). The President feels that the Government's "obligation" in this situation is not one within the meaning of section 200(a)(6), so as to still be payable under section 200(d), *see* 35 Comp.Gen. 185, 187 (1955); on this basis he doubts whether funds are still available.

On the basis of the facts now before the Court, the President raises only the question of whether Foley's reservation of the 1980 funds as an obligation under sections 200(a)(6) and 200(d) was proper, not whether it was effective. It is true, as Foley notes, that the Government still has an obligation to pay the affected workers at least the 5.5% increase due them but withheld to avoid the forfeiture provision. Moreover, in light of Foley's belief at the time he made the reservation of funds that the Government was obligated, as a result of this Court's March 24, 1980 ruling to pay the full Adjustment Act increases for 1980 to all officials of the Judiciary, this Court will not question his action in reserving funds to do so.

cials at a rate greater than the 5.5% limit set by the pay freeze for that year. The Director is thus properly before the Court, for the injury he alleges is sufficiently "distinct and palpable," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), as well as one that the remedial powers of the Court can redress, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976); *see also National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C.Cir.1974) (interpretation of interrelation of federal pay statutes is the essence of judicial duty).

■ The President urges upon the Court the general rule that a suit for a declaratory judgment challenging the interpretation or constitutionality of a statute no longer presents a justiciable case or controversy when that statute expires or is repealed during the course of the lawsuit. *See, e. g., Kremens v. Bartley*, 431 U.S. 119, 126–27, 97 S.Ct. 1709, 1713–1714, 52 L.Ed.2d 184 (1977); *Fusari v. Steinberg*, 419 U.S. 379, 387, 95 S.Ct. 523, 538, 42 L.Ed.2d 521 (1975); *Allee v. Medrano*, 416 U.S. 802, 818, 94 S.Ct. 2191, 2201, 40 L.Ed.2d 566 (1974); *Diffenderfer v. Central Baptist Church, Inc.*, 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972). This case, however, does not present the concerns raised in the cases cited. In the case most similar on the facts, *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972), plaintiffs challenged a Florida statute which authorized a tax exemption for church property used as a commercial parking lot as being in violation of the First Amendment. The Supreme Court held that subsequent repeal of the statute made the relief sought, a declaratory judgment on the constitutionality of the repealed statute, inappropriate. 404 U.S. at 414–15, 92 S.Ct. at 575–576. The Court specifically noted, however, that this was not a case "capable of repetition," *id.* at 414, 92 S.Ct. at 575 (quoting *Southern Pacific Terminal Co. v.*

*ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), nor was it a case that might produce irreparable injury if not decided immediately. Plaintiff Foley's predicament, however, is one which, in addition to presenting a still very much alive controversy, is also quite possible capable of repetition.[10] Accordingly, this Court finds the issue of the constitutional application of Public Law 96–86 to non-Article III members of the Judiciary during the fiscal year 1980, narrowly defined as it is, squarely presented by plaintiff and properly capable of resolution by the Court.

## II.

Having dispensed with defendant's preliminary objections, the Court is faced with plaintiff's own argument that his case is moot as a result of the enactment on July 8, 1980, of the Supplemental Appropriations and Rescission Act of 1980, Pub.L.No. 96–304, 94 Stat. 857 (SAR Act). Legislative history shows that, during hearings before the House Appropriations Subcommittee on the Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies on January 30, 1980, various Judicial Branch officials made requests for additional funds in order to be able to pay affected judicial officials the full 12.9% increase for fiscal year 1980, should this Court rule they were owed. (At that time this Court's ruling on the issue was still pending.) *See* Department of State, Justice, and Commerce, the Judiciary and Related Agencies Appropriations for 1981, Hearings on H.R. 7542, 96th Cong., 2d Sess. at 46–47, 63, 85, 238. After this Court's ruling on March 24, 1980, Foley wrote the Chairmen of both the Senate and House Subcommittees, advising them that, as a result of savings due to other factors, no additional funds would be required in the supplemental appropriations bill for fiscal year 1980 in order to pay judicial officials the 12.9% increase this Court had held they were due,

---

**10.** The Court notes, without commenting, that Public Law No. 97–51, 95 Stat. 958, which provides continuing appropriations for fiscal year 1982, was not signed into law by the President until October 1, 1981, after the start of fiscal year 1982. 17 Weekly Comp. of Pres. Doc. 1072 (Oct. 1, 1981).

however he would need authority to transfer funds for that payment in the amount of $4,617,000. The committee reports on the SAR Act, 1980, contain tables setting forth the amounts requested by the Director and the amounts of supplemental appropriations ("by transfer") recommended by the respective committees, all of which are identical with the Director's requests and with the amounts actually appropriated. *See* H.R.Rep.No.1086, 96th Cong., 2d Sess. 211–12, 253 (1980); S.Rep. No.829, 96th Cong., 2d Sess. 297–98 (1980).

■ Plaintiff contends that by authorizing the transfer of funds in the SAR Act to pay judicial officials the full 12.9% increase, Congress implicitly repealed Public Law 96–86, which allowed only the 5.5% increase. Aside from the established principle that "repeals by implication are not favored," *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936), and the Supreme Court's recognition in *Will* that the latter principle applies "with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill," 449 U.S. at 222, 101 S.Ct. at 484 (citing *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978)), it is obvious from the legislative history cited by Foley, and indeed from his own letters to the chairmen of the relevant subcommittees, that the appropriations to pay the full increase were made only conditionally, on the basis of this Court's March 24, 1980 ruling, and were to be held in reserve until the outcome of this litigation was known. Foley himself promised the chairman of the House subcommittee in a letter of April 22, 1980, that if funds were appropriated to pay the 12.9% increase in salaries based on this Court's ruling that they would be held in reserve and returned to the Treasury in the event the ruling, then on appeal, was reversed. In a pay order published a month thereafter, Foley again noted that the availability of the appropriated funds was dependent upon further order in this case. 45 Fed.Reg. 32355 (May 16, 1980).

Nor does section 302 of the SAR Act, which provides that "restrictions" on funds available for fiscal year 1980 "are hereby increased to the extent necessary to meet increased pay costs authorized by or pursuant to law," lend anymore support to plaintiff's contention. Clearly Congress' transferral of the funds was an act of fiscal prudence during the pendency of this litigation, not a comment on its merits.

### III.

Finally, the Court reaches plaintiff's alternative claim that section 101(c) of Public Law 96–86 is unconstitutional as applied to non-Article III officials of the Judiciary subject to the Adjustment Act because it violates the prohibition against impairment of contract stated in section 10 of Article I, as incorporated into the Fifth Amendment. *See John McShain, Inc. v. District of Columbia*, 205 F.2d 882, 883–84 (D.C.Cir.1953) (citing *Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) and *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)). Foley analogized the constitutional claim of these non-Article III officials to the claim of the Article III judges in *Will*, asserting that section 101(c) as applied to non-Article III officials, is invalid under the Fifth Amendment because, as in *Will*, it purported to revoke an increase in compensation after the increase had become effective. *Cf.* 449 U.S. at 228–29, 230, 101 S.Ct. at 487–488.

It is established that Adjustment Act increases are effective automatically on the first day of the applicable pay period of the new fiscal year, *see* 28 U.S.C. § 461; 449 U.S. at 204–05, 101 S.Ct. at 475–476, unless before midnight on September 30 the President signs a bill blocking or reducing the scheduled increase. *See* 449 U.S. at 226–29, 101 S.Ct. at 486–487. *See also National Treasury Employees Union v. Nixon*, 492 F.2d 587, 600–01, 616 (D.C.Cir.1974). Whether or not the rights of non-Article III judicial officials to Adjustment Act increases for fiscal year 1980 were "vested" as of

October 1, 1979,[11] it is certain that both Article III and non-Article III members of the Judiciary acquired effective statutory entitlements to the increases on the days they became due and payable.[12] The Constitutional consequences of revoking the right of non-Article III employees to such a statutory entitlement after they became entitled to it, although "troublesome," *see American Federation of Government Employees, AFL–CIO v. Campbell*, 474 F.Supp. 357 (D.D.C.1979), *aff'd in part and rev'd in part*, 659 F.2d 157 (D.C.Cir.1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 103, 70 L.Ed.2d 92 (1981), are not the same as the consequences of divesting Article III judges of such a right protected by the Compensation Clause.

■ In contrast to the vested rights of Article III judges under the Compensation Clause, the rights of non-Article III judicial employees to Adjustment Act increases are solely statutory. *Cf. United States v. Larionoff*, 431 U.S. 864, 869, 97 S.Ct. 2150, 2154, 53 L.Ed.2d 48 (1977); *Bell v. United States*, 366 U.S. 393, 401, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961); *United States v. Fisher*, 109 U.S. 143, 145, 3 S.Ct. 154, 155, 27 L.Ed. 885 (1883). It is settled that, absent contractual or other guarantees, a statutory entitlement may be prospectively reduced without infringement. *See United States v. Larionoff*, 431 U.S. at 879, 97 S.Ct. at 2159. In *United States v. Fisher*, the plaintiff, Chief Justice of the Territory of Wyoming, claimed he had a right to yearly compensation of $3,000, relying upon an 1870 statute which had set the compensation of territorial judges at "three thousand dollars each per annum." 109 U.S. at 144, 3 S.Ct. at 154. In appropriations acts passed in 1878, 1879, and 1880, Congress had appropriated sums of $2600.00 "in full compensation" for the services of territorial judges for each of those years. *Id.* at 144–45, 3 S.Ct. at 154–155. In holding that the appropriations acts had manifested an intent by Congress to fix the salary for those years at the lower rate and to supercede the 1870 law, the Court expressly noted that there was no provision of the Constitution which forbade a reduction. *Id.* at 145, 3 S.Ct. at 155.

■■ Even if a statutory right has become effective, Congress may at any point revoke the right for the future by altering or repealing the statute upon which it is based. The reasoning of the District Court in the recent case of *AFGE, AFL–CIO v. Campbell*, 474 F.Supp. at 357, supports this conclusion. The District Court held that even though blue-collar workers became statutorily entitled to higher salary increases on October 1 and October 8, they had no constitutional claim to those higher increases from the date the appropriations statute was enacted and forward for the balance of the fiscal year; such a prospective reduction in pay did not interfere with the workers' rights.[13] *Id.* at 360 (citing *United States v. Larionoff*, 431 U.S. at 879, 97 S.Ct. at 2159; *Bell v. United States*, 366 U.S. at 401, 81 S.Ct. at 1235; *United States v. Dickerson*, 310 U.S. 554, 60 S.Ct. 1034, 84

---

**11.** *Will* held that a salary increase "vests" for purposes of the Compensation Clause when it takes effect as part of the compensation due and payable to Article III judges. 449 U.S. at 229, 101 S.Ct. at 487. The Court of Appeals for this Circuit has used the term "vested right" to apply to the statutory entitlement of federal blue-collar workers to a salary increase under the prevailing rate statute, 5 U.S.C. §§ 5341–5349 (1976 & Supp.III 1979). *See AFGE, AFL–CIO v. Campbell*, 659 F.2d 157 at 161, 163 (D.D.C.1980).

**12.** This is in contrast to the prevailing rate statute at issue in *AFGE*, under which federal blue-collar workers acquire no vested rights until the *operative* date, when the agency actually ordered the increase. 659 F.2d at 163

(D.C.Cir.1980). This results from the Court of Appeals' conclusions that the agency has some discretion under that statute in setting wage increases. *Id.* The President's duty under the Comparability and Adjustment Acts to adjust the pay rates of judicial workers, however, is nondiscretionary. *National Treasury Employees Union v. Nixon*, 492 F.2d at 600–01.

**13.** On appeal the Court of Appeals for this Circuit held that the blue-collar workers had not become entitled to increases under the prevailing rate statute by the date on which the intervening appropriations act was passed. At 984. Accordingly, the Court did not find it necessary to reach the constitutional issue.

L.Ed. 1356 (1940); *United States v. Yoshida International, Inc.,* 526 F.2d 560 (Cust. & Pat.App.1975)). In this case non-Article III members of the Judiciary to whom Public Law 96–86 is applicable had no constitutional claim to salary increases higher than 5.5% from the date Public Law 96–86 was enacted, October 12, 1979, until the end of fiscal year 1980.

A different rule must apply with regard to the retroactive reduction of a federal employee's pay by Congress; that is, other principles come into play when Congress attempts to reduce the rate of pay for work already performed. As of October 1, 1979, or October 8, 1979, affected non-Article III judicial officials had an effective statutory right to a 7.02% or 12.9% increase in their rates of pay. That right was lost as of October 12, 1979, when Public Law 96–86 became law and reduced the statutory increase to 5.5%, but for work performed during the intervening period of eleven or four days, the affected employees are due the rates effective at those times. The right to a salary for work performed at the rate admittedly effective during the period when the work was performed is a right or property interest, a legitimate entitlement which qualifies for protection against governmental interference under the Due Process Clause of the Fifth Amendment. *See, e. g., Board of Regents v. Roth,* 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709–2710, 33 L.Ed.2d 548 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 261–63, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1980). American courts have traditionally refused to countenance retroactive legislation when it would have such an effect upon the rights of private parties. *See generally Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976); *Chevron Oil v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). The District Court in *AFGE* noted that the federal defendant in that case could cite no authority for the retroactive decrease of wage rates for services already performed, 474 F.Supp. at 359; the President in this case does not even make the argument that Public Law

96–86 should be applied retroactively. The Supreme Court in *Larionoff* viewed with displeasure the possibility that Congress might have intended to deprive a serviceman of pay for services already performed and yet owing, 431 U.S. at 879, 97 S.Ct. at 2159, and as long ago as 1850 the Supreme Court in *Butler v. Pennsylvania,* 51 U.S. (10 How.) 402, 416, 13 L.Ed. 472, noted that "[t]he promised compensation for services actually performed and accepted ... may undoubtedly be claimed both upon principles of compact and of equity...." This Court declines to accord the rights of federal employees today any less respect.