NATIONAL ASSOCIATION OF RETIRED FEDERAL EMPLOYEES, et al., Plaintiffs,

v.

Constance J. HORNER, et al., Defendants.

Civ. A. No. 85–4021.

United States District Court, District of Columbia.

April 17, 1986.

Joseph B. Scott, with whom Irving Kator and Michael J. Kator were on brief, for plaintiffs.

Richard Greenberg, Atty., U.S. Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and David J. Anderson and Judith F. Ledbetter, Attys., U.S. Dept. of Justice, were on brief, for defendants.

Keith E. Secular and John S. Bishop, Cohen, Weiss & Simon, and Devon L. Miller, Staff Atty., were on brief for amicus curiae Nat. Ass'n of Letter Carriers, AFL–CIO.

Before BORK, Circuit Judge of the United States Court of Appeals for the District of Columbia Circuit, PENN and HOGAN, District Judges of the United States District Court for the District of Columbia.

PER CURIAM:

Plaintiffs, National Association of Retired Federal Employees and its officers, four retired federal employees, seek a declaratory judgment that section 252(a)(6)(C)(i) of Pub.L. No. 99–177, 99 Stat. 1037 (1985), popularly known as the Gramm-Rudman-Hollings Act, effects an unconstitutional taking of property without just compensation under the fifth amendment. Plaintiffs also request that we permanently enjoin the defendants, the Director of the Office of Personnel Management and the United States, from applying the section to plaintiffs and their class. Both plaintiffs and defendants have moved for judgment on the pleadings. We grant the defendants' motion, deny the plaintiffs' motion, and hold that section 252(a)(6)(C)(i) is not unconstitutional as applied to plaintiffs.

I.

The facts are not in dispute. Plaintiffs represent approximately 500,000 retired federal employees receiving annuities under the Civil Service Retirement Act, 5 U.S.C. § 8331 *et seq.* (1982). As amended, the Act covers almost 90% of all federal employees and requires a mandatory 7% contribution from most covered employees which is matched by the employing agency. *See* 5 U.S.C. § 8334(a)(1). Benefit levels are determined according to a formula based on the employee's length of employment and rate of pay. *See id.* §§ 8331(4), 8339.

In 1962, Congress provided automatic increases in benefit levels to prevent any significant loss of purchasing power due to inflation. *See* Pub.L. No. 87–793, 76 Stat. 869 (1962). The cost of living adjustment

("COLA") has been altered many times since it was first enacted. The most recent instance was in 1984 when Congress altered the COLA formula and delayed the payment date to reduce the costs of the program. *See* Pub.L. No. 98–270, § 201, 98 Stat. 157 (1984), 5 U.S.C.A. § 8340(b) (West Supp.1985). Congress thought such cuts necessary because annual benefit payments and administrative expenses now vastly exceed annual employee contributions. In fiscal year 1985, for example, employee contributions amounted to only $4.5 billion while expenses exceeded $23.1 billion. *See* U.S. Office of Personnel Management, *Compensation Group Fiscal Year 1985 Annual Report* at B–2. Expenses in excess of employee contributions must be made up out of general revenues.

The 1984 enactment provides in pertinent part:

> [E]ffective December 1 of each year, each annuity payable from the Fund having a commencing date not later than such December 1 shall be increased by the percent change in the price index for the base quarter of such year over the price index for the base quarter of the preceding year in which an adjustment under this subsection was made, adjusted to the nearest ¹/₁₀ of 1 percent.

5 U.S.C.A. § 8340(b) (West Supp.1985). "Each annuity is stated as an annual amount, one-twelfth of which, rounded to the next lowest dollar, constitutes the monthly rate payable on the first business day of the month after the month or other period for which it has accrued." 5 U.S.C. § 8345(a)(1982). Thus, on December 1, 1985, retirement benefits began accruing at a rate 3.1% higher than the previous month. The increase for the first month was to be paid on January 2, 1986.

On December 12, 1985, however, the President signed into law the Balanced Budget and Emergency Deficit Control Act of 1985, Pub.L. No. 99–177, 99 Stat. 1037, which suspended payment of the COLA increase. Section 252(a)(6)(C)(i) of the Act provides in part:

> Notwithstanding any other provision of law, any automatic spending increase that would (but for this clause) be first paid during the period beginning with the date of the enactment of this joint resolution and ending with the effective date of an order issued by the President under paragraph (1) for the fiscal year 1986 shall be suspended until such order becomes effective, and the amounts that would otherwise be expended during such period with respect to such increases shall be withheld. If such order provides that automatic spending increases shall be reduced to zero during such fiscal year, the increases suspended pursuant to the preceding sentence and any legal rights thereto shall be permanently cancelled.

Pub.L. No. 99–177, § 252(a)(6)(C)(i), 99 Stat. 1037 (1985). On February 1, 1986, the President issued an order permanently cancelling as of March 1, 1986, the COLA that became effective on December 1, 1985, but that had not yet been paid. *See* Order, *Emergency Deficit Control Measures for Fiscal Year 1986*, 51 Fed.Reg. 4291 (1986).[1]

## II.

Plaintiffs' claim is that on December 1, 1985, the 3.1% COLA scheduled for the next twelve months became the private property of the plaintiffs subject only to the limitation that it was payable in twelve monthly installments accompanying pay-

**1.** In *Synar v. United States,* 626 F.Supp. 1374 (D.D.C.), *prob. juris. noted sub nom. Bowsher v. Synar,* —— U.S. ——, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986), a three-judge district court invalidated the automatic deficit reduction process on the ground that it confers upon the Comptroller General executive powers, which cannot be exercised constitutionally by an officer removable by Congress. *Id.* at 1403. This holding also rendered the President's order without legal force and effect since it was issued pursuant to the automatic reduction process. The court stayed the effect of its decision pending an appeal to the Supreme Court.

The current controversy remains justiciable, however, since, regardless of the fate of the President's order, the Act's suspension of COLA payments remains effective throughout the fiscal year. *See Synar,* 626 F.Supp. at 1381 n. 5.

514

ment of the underlying annuities. Thus, it is said that by suspending COLA payments on December 12, 1985 the Act effected a taking of plaintiffs' private property in violation of the Constitution.

The fifth amendment provides that "private property [shall not be] taken for public use, without just compensation." U.S. Const. amend. V. The dispute is whether the COLA became the "private property" of the plaintiffs on December 1, 1985. We hold that it did not.

■ Plaintiffs concede that the Constitution does not create a property right to receive the contested COLA. They also concede that no legislative history indicates anything, one way or the other, about a congressional intention to create a property right. Rather, their argument is that the plain meaning of the statute providing for COLAs establishes their property right in the COLA. They rely for that conclusion on the language making December 1, 1985, the date the COLA becomes "effective" and the language providing that "[e]ach annuity is stated as an annual amount." Thus, they claim, the 3.1% COLA for a whole year became their property on December 1 and could not be eliminated by Congress on December 12. It is utterly clear, however, that the statute cannot be read as plaintiffs wish.

*Stouper v. Jones*, 284 F.2d 240 (D.C.Cir. 1960), effectively decides the present case. The appellant there retired in 1953 and began receiving disability annuity payments pursuant to the law then in force. In 1956, Congress amended that act to discontinue benefits to certain recipients. The Civil Service Commission found that appellant fell within the designated class and discontinued her annuity payments. Appellant argued that the 1956 amendment could not "constitutionally be applied in her case because at the time of her retirement she acquired a vested right to an annuity that

could not be taken from her by subsequent legislation." 284 F.2d at 242. A unanimous panel, composed of Chief Judge Miller and Judges Burger and Bazelon, "conclud[ed] that an employee has no right under the Retirement Act based on contractual annuity principles, and [held that] the appellant had no vested right to the disability annuity which was terminated." *Id.* The court held, therefore, that a retirement benefit that had already become effective could be cancelled by Congress at any time.

Plaintiffs' efforts to distinguish their case from *Stouper* are unavailing. Plaintiffs insist that *Stouper* does not govern because they do not claim a vested right in the underlying annuities but only in the scheduled COLA increases. The argument is incoherent. If Congress is free to reduce or eliminate plaintiffs' retirement annuities, as it clearly is, acceptance of plaintiffs' claim would mean that Congress could constitutionally eliminate the entire annuity except for the 3.1% increase. This makes even less sense given plaintiffs' claim that they are entitled to the increase for an entire year because the entire annuity is calculated as an annual amount.

*Stouper* is not distinguishable on the ground that there Congress enacted new conditions upon the right to continued disability benefits and the cut off of payments occurred one year after an administrative finding that plaintiff was no longer qualified. Whatever the mechanism, Congress, there as here, legislated an end to benefits it had previously enacted. There is also no significance to the fact that in the present case Congress' cut off of future payments also eliminated amounts that had "accrued" between December 1 and December 12. Those amounts had not been paid, no property right is created by an accounting formula, and *Stouper* therefore holds that payments of any and all amounts can be precluded.[2]

**2.** Plaintiffs' reliance upon cases such as *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *Foley v. Carter*, 526 F.Supp. 977 (D.D.C.1981); and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), is utterly misplaced. *Will* held that the compensation clause of article III of the Constitution prohibits Congress from repealing an increase of judicial salaries that had gone into effect under a statutory formula. Plaintiffs here are

Nor can there be any claim that the 1984 statute establishing the scheduled COLA creates the property interest plaintiffs assert independent of the underlying statutory scheme. The statute provides that "[e]ffective December 1 of each year, each annuity ... shall be increased by" a COLA. 5 U.S.C.A. § 8340(b) (West Supp.1985). This makes clear that there is no distinction between some "underlying" annuity and the COLA. The COLA is merely part of the calculation of the current annuity. Thus, on December 1, 1985, the calculation of benefits increased by 3.1% over the previous month. Had Congress not intervened on December 12, 1985, the monthly annuity payment on January 2, 1986 would have reflected that increase. Since under *Stouper* Congress can decrease the annuity at any time, we see no reason why it cannot increase the rate at which the annuity is calculated and then decrease it again before payment.

Any other construction would be inconsistent with the history of COLA legislation. Beginning in 1976, Congress repeatedly amended the COLA provision to reduce the cost of the program. In 1976, Congress repealed the 1% "kicker" that was previously added to each COLA. *See* Pub.L. No. 94–440, 90 Stat. 1462 (1976). This repeal was upheld in *Zucker v. United States*, 758 F.2d 637 (Fed.Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 129, 88 L.Ed.2d 105 (1985). There, the court explicitly rejected the claim that retirees have a constitutionally protected right to receive COLAs based on the formula in effect at the time of their retirement. In 1981, Congress again amended the COLA provision to replace the then twice-yearly COLA with a single annual adjustment. *See* Pub.L. No. 97–35, § 1702(a), 95 Stat. 357 (1981).

The NARFE's subsequent challenge to this amendment as an unconstitutional taking of private property without just compensation was rejected in *NTEU v. Devine*, 591 F.Supp. 1143 (D.D.C.1984), on the ground that there is no "protected property interest in the COLA benefits." *Id.* at 1147; *see id.* at 1148–49.

The current COLA provision was the last congressional effort to reduce the spiraling costs of the retirement program before the enactment of Gramm-Rudman. The 1984 enactment deferred the effective date of the annual COLA from March 1 to December 1, thereby effecting substantial savings. *See* Pub.L. No. 98–270, § 201, 98 Stat. 157 (1984). It is highly unlikely that, by legislating a delay in the effective date of COLAs, Congress intended to grant plaintiffs a vested right to a year's worth of COLA increases. Certainly Congress did not believe that to have been the effect of the statute since it felt free in enacting Gramm-Rudman on December 12, 1985, to suspend the payment of scheduled COLA increases.

We need not speculate whether Congress could legislate a retirement benefit in language that precluded itself or any future Congress from decreasing or eliminating that benefit. Plaintiffs have cited no case, and we know of none, holding that Congress may tie its own hands in this fashion. Assuming that to be possible, however, it is clear that the presumption against reading a statute to have such an effect overcomes language much stronger than that under consideration here. In *Dodge v. Board of Education*, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57 (1937), a retired school teacher challenged the constitutionality of a state statute reducing the amount of her retirement annuity from $1500 to $500. The

---

not covered by the compensation clause and *Stouper* means that no other clause has a similar effect. *Foley* held that Congress could reduce a salary increase for non-article III judicial employees but could not retroactively reduce the rate of pay for work already performed. The holding rests entirely upon a quid-pro-quo concept and has no application to retirement benefits for which no services are claimed to have been performed between December 1 and

12. *Goldberg* requires procedural due process prior to the termination of welfare benefits. It has absolutely no application to this case since plaintiffs do not allege a constitutionally insufficient procedure. Neither in *Goldberg* nor anywhere else has the Supreme Court ever suggested that interests sufficient to require procedural due process must also constitute property for purposes of substantive constitutional claims.

statute in effect at the time of her retirement provided: "Each person so retired . . . *shall be paid* the sum of fifteen hundred dollars ($1500.00) annually and for life from the date of such retirement. . . ." *Id.* at 76, 58 S.Ct. at 99 (emphasis added). Despite this unconditional, mandatory language, the Court upheld the reduction, stating "[t]he presumption is that such a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Id.* at 79, 58 S.Ct. at 100.

The reasons for the strength of the presumption enunciated in *Dodge* are apparent: the legislature requires flexibility in financial matters. Hence, what the Supreme Court said of the social security program a quarter century ago applies to the retirement annuities at issue here:

> That program was designed to function into the indefinite future, and its specific provisions rest on predictions as to expected economic conditions which must inevitably prove less than wholly accurate, and on judgments and preferences as to the proper allocation of the Nation's resources which evolving economic and social conditions will of necessity in some degree modify.

*Flemming v. Nestor,* 363 U.S. 603, 610, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1437 (1960). The law is so clear and consistent that plaintiffs must be judged to have not the shadow of a case.

Defendants' motion for judgment on the pleadings is granted, plaintiffs' motion for judgment on the pleadings is denied, and plaintiffs' claim is hereby

*Dismissed.*