George SQUILLACOTE, et al., Plaintiffs,

v.

The UNITED STATES of America,
Defendant.

Civ. A. No. 81–C–1553.

United States District Court,
E.D. Wisconsin.

April 21, 1983.

Kevin M. Forde, Katrina Veerhusen, and Richard Prendergast, and William J. Harte, Chicago, Ill., for plaintiffs.

Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

## INTRODUCTION

The plaintiffs, who are employees of the United States serving as members of the Senior Executive Service, have brought a three count action against the United States pursuant to the Tucker Act, 28 U.S.C. Sec. 1346(a)(2) (1976). They challenge the salary paid by the United States government to all present and former federal employees who served as members of the Senior Executive Service during the three time periods corresponding to the three counts of the complaint.[1] The named plaintiffs represent a class consisting of all persons who were Senior Executive Service members during the relevant time periods and who were not paid at the applicable pay rates established by the President.

The parties have filed cross-motions for summary judgment. Both agree that the question before the Court is one of law. On the basis of the briefs submitted and the oral argument heard on September 28, 1982, the Court holds that there is no genuine issue of material fact presented in this case and that the defendant is entitled to judgment as a matter of law.

## FACTS

I. *Federal Pay Rates and Systems*

A. The Executive Schedule

Title 5, Chapter 53 of the United States Code establishes statutory pay systems for federal employees of various levels. Under 5 U.S.C. Secs. 5311–18, the Executive Schedule consisting of five pay levels is the basic pay schedule for several high level executive positions ranging from Cabinet Secretaries (level I, the highest) to the Director of the National Park Service and the Deputy Commissioner of the Internal Revenue Service. Senior Executive Service positions are specifically excluded. 5 U.S.C. Sec. 5311(a), (b)(2). Rates of pay for positions within the Executive Schedule are established and adjusted in accordance with the Federal Salary Act of 1967, 2 U.S.C. Sec. 351, *et seq.*

B. The General Schedule

Most civilian employees of the federal government, however, are classified and paid in accordance with the General Sched-

1. Count I covers the period from July 13, 1979, when the Civil Service Reform Act of 1978 went into effect, to October 1, 1979, the end of fiscal year 1979. Count II covers fiscal 1980, from October 1, 1979, to October 1, 1980. Count III covers fiscal 1981, from October 1, 1980, to October 1, 1981.

ule, 5 U.S.C. Secs. 5331–38. Pay rates for General Schedule employees are subject to annual adjustment under the Federal Pay Comparability Act of 1970 (Comparability Act), 5 U.S.C. Sec. 5301–08, to ensure that their salaries are brought in line with prevailing salaries in the private sector. Because no provision was made for similar annual comparability increases in Executive Schedule rates,[2] it was possible for higher level employees of the General Schedule to reach a pay level beyond those for positions within the Executive Schedule. To meet this problem, Congress imposed a pay ceiling on General Schedule employees to prevent them from receiving rates in excess of the lowest level of the Executive Schedule, level V.[3] Thus, level V limited the rates payable to General Schedule employees even though their scheduled rates were increasing by operation of the Comparability Act.

### C. The Senior Executive Service

On October 13, 1978, a third statutory pay system was established by Congress to enhance mobility in the highest level of the Civil Service and thereby to provide more fully for the government's management needs. The Civil Service Reform Act of 1978, 5 U.S.C. Sec. 5381–85, took effect July 13, 1979, and established the Senior Executive Service (SES). During the nine months between the time the Act was enacted and the time it took effect, each federal agency was to designate certain positions for SES status, and the employees serving in those positions were given the option of voluntarily converting to the SES.

Section 5382[4] of the Act provided for five or more SES rates of pay to be initially established and thereafter adjusted by the President. The highest rate is not to exceed the rate for level IV of the Executive Schedule, and the level V pay limitation of 5 U.S.C. Sec. 5308 therefore is not applicable. Finally, Sec. 5382(d) states that "[t]he rates of basic pay that are established and adjusted under this section . . . shall supersede any prior rates of basic pay for the Senior Executive Service."

### II. *The Statutory Pay Limitations*

#### A. Fiscal 1979: Pub.L. 95–391

On March 7, 1979, President Carter issued an order establishing six salary rates for SES.[5] When the new SES rates became effective on July 13, 1979, the government

---

2. The Executive Salary Cost-of-Living Adjustment Act, 5 U.S.C. Sec. 5318, enacted in 1975, ultimately provided for a comparable adjustment of Executive Schedule rates of pay each year.

3. The provision provides that "[p]ay may not be paid [to General Schedule employees], by reason of any provision of this subchapter [*i.e.,* the Comparability Act], at a rate in excess of the rate of basic pay for level V of the Executive Schedule." 5 U.S.C. Sec. 5308.

4. Section 5382 provides in full:
 "(a) There shall be 5 or more rates of basic pay for the Senior Executive Service, and each senior executive shall be paid at one of the rates. The rates of basic pay shall be initially established and thereafter adjusted by the President subject to subsection (b) of this section.
 "(b) In setting rates of basic pay, the lowest rate for the Senior Executive Service shall not be less than the minimum rate of basic pay payable for GS–16 of the General Schedule and the highest rate shall not exceed the rate for level IV of the Executive Schedule. The payment of the rates shall not be subject to the pay limitation of sections 5308 and 5373 of this title [5 U.S.C. Sec. 5308 and Sec. 5373.]
 "(c) Subject to subsection (b) of this section, effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5305 of this title [5 U.S.C. Sec. 5305] in the rates of pay under the General Schedule, each rate of basic pay for the Senior Executive Service shall be adjusted by an amount determined by the President to be appropriate. The adjusted rates of basic pay for the Senior Executive Service shall be included in the report transmitted to the Congress by the President under section 5305(a)(3) or (c)(1) of this title [5 U.S.C. Sec. 5305(a)(3) or (c)(1) ].
 "(d) The rates of basic pay that are established and adjusted under this section shall be printed in the Federal Register and shall supersede any prior rates of basic pay for the Senior Executive Service."

5. The rates established were as follows:
 | | | |
 |---|---|---|
 | SES–1 | = | $44,756 |
 | SES–2 | = | $46,470 |
 | SES–3 | = | $48,250 |
 | SES–4 | = | $50,100 |

paid the SES–1 and SES–2 positions at the rates set by the President, but adhered to a level V ceiling for the other four positions, paying them at the level V rate of $47,500. Although Sec. 5382 of the newly enacted Civil Service Reform Act established a level IV ceiling of $50,000, the government decided to apply the level V pay limitation enacted earlier in Sec. 304(a) of Public Law 95–391. This decision, the plaintiffs contend, was erroneous.

Enacted September 30, 1978, Sec. 304(a) of Pub.L. 95–391 prohibited the use of any funds appropriated for fiscal year 1979 to pay the salary of any government employee at a rate in excess of the rate payable on the date of enactment, if the rate payable to that employee was:

"(1) fixed at a rate which is equal to or greater than the rate of basic pay for level V of the Executive Schedule . . ., or

"(2) limited to a maximum rate which is equal to or greater than the rate of basic pay for such level V . . . by reason of [5 U.S.C. Sec. 5308], or any other provision of law or congressional resolution."

B. Fiscal 1980: Pub.L. 96–86

Again pursuant to Sec. 5382 of the Civil Service Reform Act, the President, on Octo-

| | | |
|---|---|---|
| SES–5 | = | $51,450 |
| SES–6 | = | $52,800 |

6. The adjusted rates of pay were as follows:

| | | |
|---|---|---|
| SES–1 | = | $47,889 |
| SES–2 | = | $49,499 |
| SES–3 | = | $51,164 |
| SES–4 | = | $52,884 |
| SES–5 | = | $54,662 |
| SES–6 | = | $56,500 |

7. Section 101(c) of Pub.L. 96–86 provides in pertinent part:

"For the fiscal year 1980, funds available for payment to executive employees, which includes Members of Congress, who under existing law are entitled to approximately 12.9 percent increase in pay, shall not be used to pay any such employee or elected or appointed official any sum in excess of 5.5 percent increase in existing pay and such sum if accepted shall be in lieu of the 12.9 percent due for such fiscal year."

The Act provides further that:

"[F]or the purpose of carrying out this provision and notwithstanding the provisions of the Federal Pay Comparability Act of 1970 [5 U.S.C. Secs. 5301–08], the Executive Salary

ber 9, 1979, issued an order adjusting SES rates of pay for fiscal 1980.[6] During the fiscal year 1980, the government continued to pay the plaintiffs and all other SES members at a rate limited by level V of the Executive Schedule. This level V rate was raised on October 12, 1979, by 5.5% from $47,500 to $50,112.50 with the enactment of Sec. 101(c) of Public Law 96–86.[7] The plaintiffs argue that 5 U.S.C. Sec. 5382 still required payment at the level IV rate, raised by 5.5% to $52,750 by Pub.L. 96–86.

C. Fiscal 1981: Pub.L. 96–369, 96–536, and 97–12

On October 16, 1980, the President issued an order adjusting SES rates of pay for fiscal year 1981.[8] The government again paid the plaintiffs and their class at the level V ceiling of $50,112.50 for fiscal 1981 instead of the level IV rate ($52,750) allegedly mandated by 5 U.S.C. Sec. 5382. In doing so, the government relied on three Joint Resolutions passed by Congress between October, 1980, and June, 1981: Pub.L. 96–369 (October 1, 1980); Pub.L. 96–536 (December 16, 1980); and Pub.L. 97–12 (June 5, 1981).

Cost-of-Living Adjustment Act [5 U.S.C. Sec. 5318], or any other related provision of law, which would provide an approximate 12.9 percent increase in pay for certain Federal officials for pay periods beginning on or after October 1, 1979, . . . the provisions of section 304 of [Public Law 95–391], which limit the pay for certain Federal offices and positions, shall apply to funds appropriated by this joint resolution or any Act for the fiscal year 1980, except that in applying such limitation the term 'at a rate which exceeds by more than 5.5 percent the rate' shall be substituted for the term 'at a rate which exceeds the rate' where it appears in subsection (a) of such section for the purpose of limiting pay increases to 5.5 percent."

8. The adjusted rates for fiscal 1981 were as follows:

| | | |
|---|---|---|
| SES–1 | = | $52,247 |
| SES–2 | = | $53,996 |
| SES–3 | = | $55,804 |
| SES–4 | = | $57,673 |
| SES–5 | = | $59,604 |
| SES–6 | = | $61,600 |

Each of these resolutions incorporated Section 306 of H.R. 7593, which prohibited the use of funds appropriated for fiscal 1981 to pay the salary of any federal employee at a rate in excess of the rate payable on September 30, 1980, if the rate payable to that employee was:

"(1) fixed at a rate which is equal to or greater than the rate of basic pay for level V of the Executive Schedule ..., or

"(2) limited to a maximum rate which is equal to or greater than the rate of basic pay for such level V ... by reason of [5 U.S.C. Sec. 5308], or any other provision of law or congressional resolution."

### D. Fiscal 1982: Pub.L. 97–92

The SES rates were adjusted for fiscal 1982 by President Reagan on October 15, 1981.[9] From the beginning of fiscal year 1982 until January 1, 1982, the salaries of all SES class members remained limited to the level V rate of $50,112.50.[10] On January 1, 1982, Pub.L. 97–92 became effective. Section 141(a) of that Act raised the ceiling on the level IV and level V rates of pay to $58,500 and $57,500 respectively.[11]

After January 1, 1982, SES salaries were capped for the first time at the level IV rate ($58,500), rather than at the new rate for level V ($57,500). This, the plaintiffs contend, was the first time they were paid the lawful rates established under 5 U.S.C. Sec. 5382(b).

## DISCUSSION

### I. Count I: Fiscal 1979

■ In Count I of the complaint, the plaintiffs seek to recover the difference between the salary amounts paid and the salary amounts which, they allege, should have been paid during the period commencing July 13, 1979, and ending October 1, 1979. The issue before the Court is whether the fiscal 1979 salary limit imposed by Section 304(a) of Public Law 95–391 was meant to govern the payment of SES members pursuant to the Civil Service Reform Act of 1978. The question is one of statutory interpretation.

The plaintiffs argue that Sec. 304(a) Pub.L. 95–391 does not by its terms apply to SES positions and that, even if it does, the rates of pay established for SES members under 5 U.S.C. Sec. 5382 supersede the earlier pay cap imposed by Sec. 304(a). Pub.L. 95–391 and the Civil Service Reform Act, they contend, are in irreconcilable conflict, and the latter and more specific statute providing for the payment of SES employees, at least impliedly if not expressly, repeals Sec. 304(a) just as Sec. 411 of the Bankruptcy Reform Act of 1978 did in setting the salary of the bankruptcy judges.

The government, on the other hand, asserts that the executive employees in this case who converted to SES status remained subject to the pre-existing salary limitation of Pub.L. 95–391. Its argument is based also on legislative history surrounding the enactment of Public Law 96–86, the salary limitation for fiscal year 1980. That Act carried forward the Sec. 304(a) salary cap for certain federal employees. The government emphasizes Congress' failure to disapprove of the payment of SES members in fiscal 1979 at level V instead of level IV, and points to the Conference Report on

---

**9.** The fiscal 1982 rates were set at:

| | | |
|--------|---|----------|
| SES–1 | = | $54,755 |
| SES–2 | = | $56,936 |
| SES–3 | = | $59,119 |
| SES–4 | = | $61,300 |
| SES–5 | = | $62,950 |
| SES–6 | = | $64,600 |

**10.** The plaintiffs do not request payment for any compensation that may be due for the period October 1, 1981, to January 1, 1982.

**11.** Section 141(a) of Pub.L. 97–92 provides in pertinent part that:

"[T]he rate of salary or basic pay, payable to any individual ..., [shall not] be limited to or reduced to an amount which is less than—

\* \* \* \* \* \*

(2) $58,500, if such individual has an office or position the salary or pay for which corresponds to the rate of basic pay for level IV of the Executive Schedule ...; or

(3) $57,500, if such individual has an office or position the salary or pay for which corresponds to the rate of basic pay for level V of the Executive Schedule ..."

Pub.L. 96–86, H.R. 96–513, as evidence that Sec. 304(a) was intended to cover the SES in fiscal year 1979.

Sec. 304(a) of Pub.L. 95–391 was passed on September 30, 1978. As a result, the salaries of certain federal employees were frozen during fiscal year 1979 at their September 30 level. This salary cap applied to any government position whose salary, on September 30, 1978, either was fixed at level V or above under the Executive Schedule or was limited to level V or above by 5 U.S.C. Sec. 5308 or some other statutory ceiling. Pub.L. 95–391, Sec. 304(a)(1)–(2) (1979). It is not disputed that the plaintiffs, prior to their conversion to SES status, were subject to this salary cap for fiscal 1979.

On July 13, 1979, the conversion of the plaintiffs to SES status became effective and the Civil Service Reform Act of 1978 went into operation. Sec. 5382(b) of the Reform Act established an independent salary cap for the SES members at level IV of the Executive Schedule and specifically exempted them from the level V limitation imposed on General Schedule employees by Sec. 5308 of Title 5.

This Court concludes first that as a matter of law, the plaintiffs, after conversion to SES employees, remained subject to the salary limitation of Pub.L. 95–391, Sec. 304(a)(2). As the briefs in this case reflect, the legislative histories of the Civil Service Reform Act and Pub.L. 95–391 are not helpful because neither makes direct reference to the other.

Admittedly, Congress failed to make Sec. 304 expressly applicable to SES members even though the CSRA was an important piece of legislation pending at the time. This fact, however, is not particularly enlightening. Similarly, it is neither significant nor necessarily illogical for Congress to have enacted a level IV cap for SES members presumably with knowledge of the earlier Sec. 304 limitation.

The Court holds that the CSRA did not create new positions which would enable the plaintiffs, by converting to those positions, to move out from under the fiscal 1979 pay cap. For the purposes of Pub.L. 95–391, the plaintiffs, after conversion to SES status, were regarded as continuing to hold "office[s] or position[s]" existing on September 30, 1978.

Additionally, once the plaintiffs had converted to SES status, they remained subject to the language of Sec. 304(a)(2). Under Sec. 5382(b) of the CSRA, the salary of SES members was limited to the level IV rate, "a maximum rate which is equal to or greater than the rate of basic pay for such level V [and which is imposed] by reason of [a] provision of law or congressional resolution." See Sec. 304(a)(2), Pub.L. 95–391 (1979).

Indeed, Sec. 5382(b) itself specifically exempts SES employees from two particular pay limitations (5 U.S.C. Secs. 5308, 5373) but omits to mention Pub.L. 95–391. Therefore, between July 13, 1979, and September 30, 1979, when Pub.L. 95–391 expired, the plaintiff class of SES employees remained within the language of Sec. 304(a).

The Court also concludes as a matter of law that the rates of pay for SES employees established pursuant to 5 U.S.C. Sec. 5382(a) did not supersede or repeal Sec. 304(a) with regard to SES members. The plaintiffs contend that, even if Sec. 304(a) applied to SES members, the CSRA was in direct conflict with Pub.L. 95–391.

Consequently, they assert that the CSRA superseded Sec. 304 because it is the more specific act, it was enacted subsequent to Sec. 304, and it contains express language of repeal.

Sec. 5382(d) of the CSRA states that "[t]he rates of basic pay that are established and adjusted under this section ... shall supersede any prior rates of basic pay for the Senior Executive Service." 5 U.S.C. Sec. 5382(d) (1978). This is not an express repeal of Pub.L. 95–391, Sec. 304(a).

"The chief value of an express repeal is in the fact that it generally leaves no uncertainty as to whether the statutes or parts of statutes designated have been repealed.... Any description that iden-

tifies the affected act with reasonable certainty will suffice to hold the designation proper and to give effect to the repeal in accordance with the terms of the statute."

1A Sutherland Statutory Construction Section 23.07, at 219 (Sands 1972).

Sec. 5382(d) does not describe Pub.L. 95–391 with reasonable certainty. In fact, in the judgment of this Court, it cannot be interpreted to apply to Sec. 304(a) at all. As a salary limitation, Sec. 304(a) set *payable* rates for certain high-level federal employees. Sec. 5382(d), however, must be read to refer to *scheduled* rates of basic pay for the SES.

In Sec. 5382(a), the President is given the authority to establish and adjust an initial SES Schedule. In his Memoranda of March 7, 1979, President Carter established six scheduled rates of pay for the SES and warned the executive agencies that "the amounts *payable* to an individual before October 1, 1979, may be limited to the pay cap contained in Public Law 95–391." (Emphasis added). Plaintiffs' Exhibit 2, Memorandum of March 7, 1979 (PMX–2). Sec. 5382(d), therefore, provides that scheduled SES rates established and adjusted pursuant to subsection (a) shall supersede any prior scheduled rates. It cannot be understood to repeal all prior rates payable to the SES under pre-existing salary caps.

 Alternatively, the plaintiffs argue that the CSRA impliedly repeals Sec. 304(a). It is presumed that legislatures intend to achieve a consistent body of laws; consequently, when this consistency cannot be maintained without the abolition of previous legislation, a repeal by implication may be found in the terms of the later enactment. Such a repeal is ultimately determined by the necessary effect of the later enactment when applied in accord with the legislative intent. *See* 1A Sutherland Statutory Construction Sec. 23.09, at 223 (Sands 1972).

 The plaintiffs aptly cite two rules of statutory construction to guide the Court in finding an implied repeal. The first rule provides that, in the absence of any clarifying statutory language or legislative history, the later of two conflicting statutes will supersede the earlier. *See, e.g., Hines, Inc. v. United States,* 551 F.2d 717 (6th Cir. 1977). The second dictates that, absent a clear intention to the contrary, the terms of a specific statute will prevail over those of the more general statute, without regard to the priority of enactment. *See, e.g., Morton v. Mancari,* 417 U.S. 535, 550–5, 94 S.Ct. 2474, 2482–85, 41 L.Ed.2d 290 (1974).

 Both rules presuppose the existence of a clear statutory conflict. In determining whether such a conflict exists, however, a court must be guided by the well-recognized presumption against implied repeals. This presumption is overcome only by a showing that "the two acts are irreconcilable, clearly repugnant as to vital matters to which they relate, and so inconsistent that the two cannot have concurrent operation." 1A Sutherland Statutory Construction Sec. 23.10, at 231 (Sands 1972). If the subsequent enactment can be given effect by any reasonable construction, the inconsistency is not fatal and no repeal will be effected. *See Id.* Sec. 23.09, at 224.

 Although this Court is not convinced by the plaintiffs' argument that the CSRA is a more specific enactment than Pub.L. 95–391,[12] a decision on the issue is not necessary because, when the acts are construed in light of the relevant legislative history and with the aim of giving effect to both, their inconsistency is not fatal.

As this decision has already made clear, the statutory language of the CSRA can be dovetailed into the language of P.L. 95–391 without thwarting the operation of either act. Sec. 304(a) prohibited salaries in excess of level V. The CSRA permits salaries up to level IV. In 1979, the President es-

---

**12.** Public Law 95–391 effects a temporary (one year) freeze on the salaries of a wide variety of high-level federal employees. The Civil Service Reform Act, although limited to a more select group of employees, is not temporally circumscribed and, in fact, is quite comprehensive in its revision of the civil service system.

tablished a schedule of SES rates which exceeded the pre-existing Sec. 304 pay cap. The SES Schedule, like the General and Executive Schedules, establishes salary rates to which the language of Sec. 304(a) applies.

The purpose of the CSRA, nevertheless was to create an executive level entitled to higher pay and capable of luring qualified personnel into government management. Although by applying the fiscal 1979 pay cap to the employees who converted to SES this statutory purpose is impeded to some extent, subsequent legislative history quite clearly indicates that Congress was aware of these cross-purposes and intended to cap even the SES salaries in 1979 in order to continue its fight against inflation.

As the plaintiffs correctly note, the legislative history of the CSRA, the most relevant source of Congress' intent, is silent as to the applicability of the Pub.L. 95–391 pay cap on SES salaries. Nevertheless, meaningful guidance is found in the legislative history of Pub.L. 96–86, the salary limitation of fiscal year 1980.

Discussed in more detail below, Public Law 96–86 took effect on October 1, 1979. It specifically extended Sec. 304(a)'s pay limitation for another fiscal year to ensure that federal salaries did not rise more than 5.5%. Having been passed subsequent to the CSRA, Pub.L. 96–86 is more revealing as to whether Congress intended to cap SES salaries in fiscal 1980 and also whether it had intended to cap those salaries in fiscal 1979 by enacting the predecessor act, Pub.L. 95–391.

House Joint Resolution 404, which later became Public Law 96–86, was considered and passed by the House on October 9, 1979, and by the Senate on October 10, 1979. A conference committee discussed the two versions of the bill and issued House Report No. 96–513 to accompany House Joint Resolution 412, the compromise version of the proposed legislation. On October 12, 1979, both houses of Congress agreed to the report.

The report, in referring to the agreement to restrict cost-of-living increases in federal salaries to 5.5%, included the following paragraph.

> The conferees wish to note that by continuing the application of Sec. 304 of the Legislative Branch Appropriation Act, 1979 [Pub.L. 95–391], the joint resolution ensures that many individuals in positions which were transferred to the new Senior Executive Service (SES) may not receive pay increases of more than 5.5 percent. *Although under the Civil Service Reform Act the maximum rate of pay for the SES is set at level IV of the Executive Schedule, those positions transferred into the SES earlier this year which on September 30, 1978, were subject to the level V ceiling will continue to be subject to the level V ceiling.*

H.R.Rep. No. 96–513, 96th Cong., 1st Sess., at 3 (1979) (emphasis added).

This language conveys the firm belief held by Congress that the newly designated SES positions were indeed subject to the preexisting level V salary limitation in fiscal year 1979 and that this limitation on the salaries of SES members was to *continue* in fiscal year 1980 *despite* the level IV ceiling imposed by the Civil Service Reform Act. Recognizing that Sec. 304 imposed a level V ceiling on SES salaries in fiscal 1979, Congress then applied the pay cap of Pub.L. 95–391 to all funds appropriated for fiscal year 1980 and expressly extended the level V limitation. The Court finds this evidence, when viewed in conjunction with an accommodating interpretation of the statutory language, persuasive of Congress' intent to subject the plaintiff class to the pay limitation of Pub.L. 95–391.

■ Admittedly, legislative inaction is a "weak reed upon which to lean" in construing a statute. 2A Sutherland Statutory Construction Sec. 49.10, at 261 (Sands 1972). Nevertheless, a much stronger case is made when, as here, Congress is fully aware of an earlier legislative interpretation and, with that knowledge, takes legislative action pertaining to the construed statute which directly affirms that prior interpretation. *Id.* at 262.

Congress, it seems, was aware that the government had construed Sec. 304(a) to limit the pay of SES members to level V. In enacting Pub.L. 96–86, Congress did not reject the government's understanding of the legislature's intent, but instead told the government to proceed in the same manner for the following year.

The plaintiffs, however, challenge the government's reliance on an isolated committee report as contrary to the rule in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In *Hill,* the Supreme Court affirmed a lower court decision enjoining the completion of the Tellico Dam, which threatened to destroy the habitat of the snail darter, a small fish designated as an endangered species. When the multimillion-dollar dam project was nearly completed, the Secretary of the Interior issued a regulation pursuant to Section 7 of the Endangered Species Act ordering all federal agencies, in effect, to preserve the habitats of endangered species. Congress, however, continued to appropriate funds for the dam, indicating clearly in committee reports that it regarded the Endangered Species Act as inapplicable to the Tellico project.

■ The Supreme Court held that the language of the Endangered Species Act was plain and its legislative history clear in making no exception for projects like Tellico. Indeed, Congress contemplated that the Act's goals might even require the sacrifice of ongoing projects, 437 U.S. at 172–87, 98 S.Ct. at 2290–98. The Court further held that statements in the subsequent appropriations committee reports did not constitute an implied repeal of the Endangered Species Act. *Id.* 189–93, 98 S.Ct. at 2299–2301. The case thus stands for the proposition that an appropriations committee's expression does not operate to repeal or modify substantive legislation in which "Congress has spoken in the plainest of words." *Id.* 194, 98 S.Ct. at 2302.

Neither the language nor the legislative history of Sec. 304 and the CSRA expresses the clear Congressional purpose present in *TVA v. Hill.* Indeed, Congress was silent on the effect its Civil Service Reform Act would have on pre-existing salary limitations. Furthermore, the conference report quoted above at Page 16 is not construed in this case as effectuating an implied repeal of Sec. 5382(d) of the CSRA. Rather, it is used as a tool for ascertaining Congress' intent in capping SES salaries notwithstanding the limitation of Pub.L. 95–391.

■ Certainly, House Report 96–513 is no more a legislative enactment than the views of appropriations committee members. Unlike the isolated expressions in *Hill,* however, the report came to the attention of the Congress as a whole and in fact was passed by both houses. Although House Report 96–513 cannot be considered part of the legislative history of either Pub.L. 95–391 or the CSRA and thus cannot override the unmistakable intent of the Congress that enacted those earlier statutes, when the precise intent of that enacting Congress is obscure, the views of the subsequent Congress as embodied in the House Report are entitled to significant weight as an expert opinion in the search of legislative intent. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980). *See* 2A Sutherland Statutory Construction Sec. 49.-11, 4th ed. C. (Sands 1972). The plaintiffs' reliance on *TVA v. Hill,* therefore, is misplaced.

Finally, the plaintiffs contend that the CSRA was a substantive legislative reform which superseded the appropriations limitation of Sec. 304(a) just as the Bankruptcy Reform Act of 1978, Pub.L. 95–598, superseded the same provision in setting the salary of bankruptcy judges. Prior to this bankruptcy reform legislation, referees in bankruptcy were paid an annual salary of $48,500, below their scheduled rate of $51,-200, because of the limitation imposed under Sec. 304(a) of Pub.L. 95–391. On November 6, 1978, the provision of the Bankruptcy Reform Act that related to the compensation of the new bankruptcy judges became effective. *See* Pub.L. 95–598, Sec. 402(d). That provision set the salary of United States bankruptcy judges at $50,000

and, as of November 6, 1978, superseded all prior rates of pay, including the pay limitation of Pub.L. 95–391. *See Foley v. Carter,* 526 F.Supp. 977, 980 n. 4 (D.D.C.1981).

The analogy between the Civil Service Reform Act and the Bankruptcy Reform Act adds little to the plaintiffs' argument. Although both statutes are major pieces of reform legislation, they are not alike in their effect on prior pay limitations. The bankruptcy reform law effected a substantive reorganization of the bankruptcy system. In doing so, Congress created a new judicial position to replace the old referee in bankruptcy. This new position of United States bankruptcy judge was conferred new substantive responsibilities [13] and a salary commensurate with those responsibilities. The pay cap of Pub.L. 95–391 simply did not carry over to those employees found qualified to serve in the new judicial capacity.

Similarly, the Civil Service Reform Act effected a major reorganization of the civil service system in order to lure greater talent into the managerial positions of government service. This reform, however, was accomplished not by creating new senior positions with superior responsibilities, but by adjusting the pay system of the civil service. Federal employees holding certain managerial and supervisory positions were offered the option to convert to a higher paying status. Although there were also nonfinancial advantages and disadvantages in converting to SES status, the SES level employee did not assume a new position with new responsibilities. He thus remained subject to the pre-existing pay limitation imposed by Congress for fiscal 1979, while the United States bankruptcy judge did not.

## II. *Count II: Fiscal 1980*

Count II of the complaint alleges that the government improperly withheld pay from the plaintiffs during fiscal year 1980, commencing October 1, 1979, and ending Octo-

ber 1, 1980. On October 9, 1979, President Carter established the schedule of SES rates of pay for fiscal 1980. *See supra* note 6. During fiscal year 1980, however, the plaintiffs were still paid at a rate limited by level V of the Executive Schedule. The government asserts that this level V pay cap was made applicable to SES members through fiscal 1980 by Sec. 101(c) of Pub.L. 96–86. The plaintiffs contend that Sec. 5382 of the CSRA continued to require payment at the higher level IV rate through fiscal 1980 and that Sec. 101(c) did not apply to SES members.

Sec. 101(c), Pub.L. 96–86, had the effect of limiting the automatic salary increases for certain employees to 5.5% of existing pay. *See supra* note 7. There can be little doubt that Sec. 101 was meant to limit the pay of SES employees. Public Law 96–86 explicitly carried forward the fiscal 1979 pay cap imposed by Pub.L. 95–391, Sec. 304(a) through fiscal year 1980. This Court has already held in Part I of its discussion that the Sec. 304(a) pay limitation applied to rates payable to SES employees. Furthermore, in passing Pub.L. 96–86, House-Senate conferees confirmed Congress' intention to limit the 1980 pay raise of SES members to 5.5% of existing pay:

> The conferees wish to note that by continuing the application of Sec. 304 of the Legislative Branch Appropriation Act, 1979 [Pub.L. 95–391], the joint resolution ensures that many individuals in positions which were transferred to the new Senior Executive Service (SES) may not receive increases of more than 5.5 percent.

H.R.Rep. No. 96–513, 96th Cong., 1st Sess., at 3 (1979). Thus, during fiscal 1980 the level V pay cap continued to limit SES salaries. The government paid its SES members at this level V rate, as adjusted by Pub.L. 96–86 in fiscal 1980, and is entitled to judgment as a matter of law on Count II.

---

**13.** These new responsibilities came under constitutional attack in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* ——

U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

### III. *Count III: Fiscal 1981*

Finally, in Count III of the complaint the plaintiffs seek to recover the portions of their salary improperly withheld during fiscal year 1981, commencing October 1, 1980, and ending October 1, 1981. During this period the government continued to adhere to the level V limitation on payable rates for its SES employees. This limitation for fiscal 1981 was premised on three Joint Resolutions (Pub.L. 96–369, 96–536, and 97–12) which froze the pay of federal employees who were subject to salary ceilings of level V or above. The salaries were frozen at the rate payable on September 30, 1980. *See supra* Page 342.

■ The salary freeze imposed by these resolutions applied to all SES employees whether their pay was capped either at level IV or at level V. The plaintiffs' Count III claim arises because the government froze SES salaries at the level V rate, which it asserts was payable on September 30, 1980, rather than the level IV rate which the plaintiffs contend was mandated by Sec. 5382 of the CSRA. Consequently, the legal issue presented in Count III is whether the rate payable for SES salaries on September 30, 1980—the end of fiscal 1980—was properly capped at level V of the Executive Schedule. In Part II of its discussion, this Court held that Pub.L. 96–86, Sec. 101(a) operated to cap SES salaries at level V during fiscal year 1980. Therefore, during fiscal year 1981, the plaintiffs' salaries were frozen at the proper rate and it follows from the discussion regarding Count II that the government likewise is entitled to judgment on this third claim for relief.

### CONCLUSION

In sum, the salaries paid to the plaintiffs during the fiscal years in question were properly limited by the level V ceiling initially imposed in Pub.L. 95–391 and carried forward in subsequent statutory pay caps.

WHEREAS there are no issues of material fact and the government is entitled to judgment as a matter of law,

NOW, THEREFORE, IT IS ORDERED that the defendant's motion for summary judgment is granted and the plaintiffs' motion for summary judgment is denied.